**KNIGHTS OF KU KLUX KLAN and Nathan Robb, Plaintiffs,**

v.

**ARKANSAS STATE HIGHWAY AND TRANSPORTATION DEPARTMENT, et al., Defendants.**

**Civ. No. 92–3045.**

United States District Court, W.D. Arkansas, Harrison Division.

Nov. 2, 1992.

---

James G. Lingle, Rogers, AR, for plaintiffs.

Andrew Beavers, Robert L. Wilson, Charles Johnson, Little Rock, AR, for defendants.

## MEMORANDUM OPINION

### H. FRANKLIN WATERS, Chief Judge.

This is a case in which the Knights of the Ku Klux Klan and Nathan Robb [1], a Boone County, Arkansas, citizen filed suit against the Arkansas State Highway and Transportation Department, its director, and various other individuals connected with the department including the individual members of the Arkansas State Highway Commission, seeking a declaratory judgment that the department's denial of the Klan's application to participate in the state-developed, sanctioned and promoted "Adopt–A–Highway Program" violated their constitutional rights afforded by various articles and amendments to both the United States Constitution and the constitution of the State of Arkansas. Plaintiffs ask for a declaratory judgment so declaring and for certain preliminary and permanent injunctive relief.

Currently pending before the court is a motion for summary judgment filed by the plaintiffs contending that there are no gen-

uine issues of material facts to be determined by the court and that, thus, they are entitled to judgment as a matter of law.

### I. Undisputed Facts

While the defendants in their brief contend that there are certain disputed facts which they argue precludes the court from entering a summary judgment in this case, the court believes that there are certain dispositive facts which are undisputed and they will be summarized below.

Sometime prior to December of 1991 the Arkansas State Highway and Transportation Department, acting through its employees and agents, established in Arkansas a litter control program for the state's highways known as the "Adopt–A–Highway Program". The policy statement issued in respect to the program stated, *inter alia:*

> Businesses, individuals, and other groups are permitted to adopt a section of highway for the purpose of litter control and to receive Departmental recognition for their participation in the program.

> The Department will erect an appropriate sized sign along the adopted highway section to provide public recognition to the adopting organization for their participation in the program. The sign will have a maximum of 34 spaces available for the name of the adopting organization, limited to two lines with 17 characters per line....

> News media coverage will be encouraged to promote the Adopt–A–Highway Program and to recognize participating organizations.

> Upon successful completion of participation in the program, the adopting organization will be presented a certificate of recognition on their anniversary date by the Department.

It was provided that, upon a business, individual, or group "adopting a highway" the Arkansas State Highway and Transportation Department would:

---

1. It appears that Nathan Robb is the son of Pastor Thomas Robb of Harrison, Arkansas who is, or at least claims to be, the "National Director of the Klan", sometimes also known as the "Grand Wizard". *See* Issue # 86 of the Klan newspaper, *"White Patriot—World–Wide Voice of the Aryan People"*, a copy of which is attached as Exhibit 8 to the defendants' response to the motion for summary judgment.

Erect an identification sign on each end of the adopted highway section to recognize the adopting organization's activities and efforts.

Issue the adopting organization a 'Certificate of Recognition' upon completion of each year's successful participation in the Adopt–A–Highway Program.

In December of 1991 Nathan Robb applied to participate in the program. In the application, Mr. Robb, acting in behalf of the Klan, applied to adopt one mile of U.S. Highway 65 at the Arkansas/Missouri State line in Boone County, Arkansas, and asked that the signs to be erected show that the segment of highway had been adopted by the Knights of the Ku Klux Klan. The court notes that U.S. Highway 65 is a highway running generally north-south from the north-central portion of the United States across Arkansas to a point at or near the Gulf of Mexico.

By memorandum dated December 9, 1991, Robert L. Wilson, Chief Counsel for the Arkansas State Highway and Transportation Department wrote to Ralph Fulton, District Engineer, District 9 (the district in which the subject portion of Highway 65 was located). In that memorandum, Mr. Wilson said:

It is my understanding that Nathan Robb has made a request to adopt a certain segment of Highway 65 in Boone County, Arkansas. Said segment would begin at the Arkansas/Missouri line and run southward one mile along Highway 65. Mr. Robb indicated that he wanted the 'Knights of the Ku Klux Klan' placed on the identification signs on Highway 65.

The utilization of the identification signs bearing the 'Knights of the Klu (sic) Klux Klan' would be harmful to the public image of the Adopt–A–Highway Program and to the Arkansas State Highway and Transportation Department. It would also pose a safety hazard to the participants, to the passing motorists, and to the Arkansas State Highway and Transportation Department employees.

Moreover, Highway 65 in Boone County was constructed primarily with Federal funds. The participation of the Ku Klux Klan could jeopardize the State's eligibility in receiving Federal funds for future construction projects along Highway 65.

In addition, State funds are used to construct the identification signs that are a part of the Adopt–A–Highway Program. Because of the Klan's discriminatory practices, it would not be consistent with the aims of the State to spend State funds for signs that would promote the Klan.

Therefore, it is my recommendation that the application be denied.

In the response of the defendants to Interrogatory No. 7 propounded by plaintiffs, the defendant gave further reasons for its denial of the application as follows:

The Knights of the Ku Klux Klan is an overtly and patently racially and religiously discriminatory organization. Furthermore, participation by the Knights of the Ku Klux Klan in the Adopt–A–Highway Program would disrupt the designated function of the highway right of way.

It is undisputed that, from the time the Adopt–A–Highway Program was begun until December 9, 1991, when the Klan application was made, 2,220 applications were received from diverse political, business and religious interests and individuals. These groups include various political parties, churches, various fraternal orders and lodges, chamber of commerce groups, labor unions, Greek letter fraternities and sororities and a myriad of other organizations proposing and advocating various religious, commercial, and political views. Many of these organizations, individuals, or groups appear to have a primary purpose of influencing social or political policies, such as the NAACP, the National Organization for the Reform of Marijuana Laws (NORML), numerous churches of various persuasions, and Democrat and Republican political clubs. Further, the groups include a considerable number of large and small commercial entities ranging from retailing giant Wal–Mart and poultry giant Tyson Foods and restaurant chains such as McDonald's to small, local, sole proprietorships. It is admitted that none of the more

than 2200 applications were denied until the Klan application was received.

## II. *Summary Judgment*

The law clearly is that summary judgment is appropriate only when there is no genuine issue of material fact, so that the dispute may be decided on purely legal grounds. *Holloway v. Lockhart*, 813 F.2d 874 (8th Cir.1987); Fed.R.Civ.P. 56. The Supreme Court has issued the following guidelines for trial courts to determine whether this standard has been satisfied.

The inquiry performed is the threshold inquiry of determining whether there is a need for trial—whether, in other words, there are genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). *See also Agristor Leasing v. Farrow*, 826 F.2d 732 (8th Cir.1987); *Niagara of Wisconsin Paper Corp. v. Paper Industry Union–Management Pension Fund*, 800 F.2d 742, 746 (8th Cir.1986).

The Eighth Circuit Court of Appeals has advised trial courts that summary judgments should be cautiously invoked so that no person will be improperly deprived of a trial of disputed factual issues. *Inland Oil & Transport Co. v. United States*, 600 F.2d 725 (8th Cir.1979), *cert. denied*, 444 U.S. 991, 100 S.Ct. 522, 62 L.Ed.2d 420 (1979). The Court has recently reviewed the burdens of the respective parties in connection with a summary judgment motion. In *Counts v. M.K.–Ferguson Co.*, 862 F.2d 1338 (8th Cir.1988), the court stated:

[T]he burden on the party moving for summary judgment is only to demonstrate, *i.e.*, '[to] point[ ] out to the District Court,' that the record does not disclose a genuine dispute on a material fact. It is enough for the movant to bring up the fact that the record does not contain such an issue and to identify that part of the record which bears out his assertion. Once this is done, his burden is discharged, and, if the record in fact bears out the claim that no genuine dispute exists on any material fact, it is then the respondent's burden to set forth affirmative evidence, specific facts, showing that there is a genuine dispute on that issue. If the respondent fails to carry that burden, summary judgment should be granted.

*Id.* at 1339, *quoting, City of Mt. Pleasant v. Associated Elec. Coop.*, 838 F.2d 268, 273–74 (8th Cir.1988) (citations omitted) (brackets in original).

The defendants contend in their response to the motion for a summary judgment, at p. 3, that there are several disputed issues of material fact, and they list those issues. However, after a careful study of them, the court has determined that the listed items do not, in reality, create issues of fact which make a difference in the outcome of this case and, in fact, many if not most of the items listed are really a listing of legal issues that must be determined by the court or, if some of them are, in fact, factual issues, the determination of them, for the reasons set forth below, will not make a difference in the result.

The fact is that there is no dispute but that the Arkansas Highway and Transportation Department created and operated a program which, by its very terms, was intended not only to aid in litter control on the highways in Arkansas but to encourage participation and reward participants by giving them a forum in which to advertise their organization or group and to make sure that the traveling public recognized that they were "doing good" by helping control litter on the nation's highways.

It is also not disputed that well over 2200 diverse persons, groups, organizations, and businesses had applied to participate in the program prior to the application by the Klan, and that not one of those applications was refused.

It is admitted that, when the Klan application was received, the department immediately consulted with counsel and began a plan to prohibit the Klan from participating because, among other reasons, participation would "be harmful to the public image of the Adopt–A–Highway Program and to the Arkansas State Highway and Transportation Department" because the applicant is an "overtly and patently, ra-

cially, and religiously discriminatory organization."

The court concludes that there is no genuine issue of any material fact important to a determination of the issues before the court, and, for this reason, that summary judgment is appropriate.

### III. Are participants in the program engaged in "speech" and, if so, is U.S. Highway 65 a public forum?

Freedom of speech long has been recognized as one of the preeminent rights in this country, the touchstone of individual liberty. *See* Ronald D. Rotunda and John E. Nowak, *Treatise on Constitutional Law: Substance and Procedure,* § 20.2 (2d Edition 1992). However, first amendment guarantees prohibiting Congress from passing laws abridging speech, press, or peaceful assembly have never been treated as absolute by the Supreme Court. Rather, the Court has preferred the view that, in certain situations, an individual's right to freely express his or her beliefs must be subordinated to other interests of society. *Whitney v. California,* 274 U.S. 357, 375–76, 47 S.Ct. 641, 648, 71 L.Ed. 1095 (1927) (Brandeis, J., concurring), *overruled by Brandenburg v. Ohio,* 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969).

Nevertheless, a willingness on behalf of the Court to balance first amendment guarantees against other interests has not diminished the importance of first amendment rights of free speech and assembly as implicated by the Knights of the Ku Klux Klan in this matter.

In most free speech cases, including this one, the inquiry to be made in determining whether the right to speak has been abridged is a two step process. The court must determine whether the speech in question is protected, and if so, before the issue is decided, the court must then identify the nature of the forum, because the extent to which the government may limit access depends upon whether the forum is public or non-public. Finally, the court must assess whether the justifications for exclusion from the relevant forum satisfy the requisite standard. *See Cornelius v. N.A.A.C.P. Legal Defense & Educational Fund, Inc.,* 473 U.S. 788, 797, 105 S.Ct. 3439, 3446, 87 L.Ed.2d 567 (1984).

Protected speech is not equally permissible in all places at all times. *Cornelius,* 473 U.S. at 799, 105 S.Ct. at 3447. Nothing in the Constitution requires a state to grant access to everyone who wishes to exercise their right of free speech on every type of government property without regard to the nature of the property or to the disruption that might be caused by the speaker's activities. *Jones v. North Carolina Prisoners' Labor Union,* 433 U.S. 119, 136, 97 S.Ct. 2532, 2543, 53 L.Ed.2d 629 (1977). Recognizing that the government, " 'no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated,' " *Greer v. Spock,* 424 U.S. 828, 836, 96 S.Ct. 1211, 1217, 47 L.Ed.2d 505 (1976), the Court has adopted a forum analysis as a means of determining when the Government's interest in limiting the use of its property "outweighs the interest of those wishing to use the property...." *Cornelius,* 473 U.S. at 800, 105 S.Ct. at 3447–48. The degree of permissible regulation hinges upon this very important categorization of the forum.

The Court has recognized at least three categories of government property. The first category includes "places which by long tradition or by government fiat have been devoted to assembly and debate ...," *Perry Educ. Ass'n. v. Perry Local Educators' Ass'n,* 460 U.S. 37, 45, 103 S.Ct. 948, 954, 74 L.Ed.2d 794 (1982), such as streets, sidewalks and parks which "have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Hague v. Committee for Industrial Organization,* 307 U.S. 496, 515, 59 S.Ct. 954, 964, 83 L.Ed. 1423 (1939). In these "quintessential public forums," the rights of the state to limit expressive activity are sharply circumscribed. For the state to enforce a content-based exclusion, it is required to show that its regulation is necessary to serve a compelling state interest and that it is narrowly

drawn to achieve that end. *Carey v. Brown,* 447 U.S. 455, 461, 100 S.Ct. 2286, 2290–91, 65 L.Ed.2d 263 (1980). The state may also enforce regulations of time, place, and manner of expression which are content-neutral, are narrowly tailored to serve a significant governmental interest and leave open ample alternative channels of communication. *United States Postal Service v. Council of Greenburgh Civic Ass'ns,* 453 U.S. 114, 132, 101 S.Ct. 2676, 2686–87, 69 L.Ed.2d 517 (1981).

■ A second category consists of public property which the state has opened for use by the public as a place for expressive activity. A designated public forum may be created for a limited purpose such as use by certain groups or for the discussion of certain subjects. *Perry,* 460 U.S. at 46, n. 7, 103 S.Ct. at 955 n. 7 (citations omitted). The Constitution, however, forbids a state from enforcing certain exclusions from a designated public forum even if it was not required to create the forum in the first place. *Widmar v. Vincent,* 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981).

■ The government does not create a public forum by inaction but only by intentionally opening a nontraditional forum for public discourse. *Cornelius,* 473 U.S. at 802, 105 S.Ct. at 3449. In determining whether a public forum has been designated, the courts look "to the policy and practice of the government to ascertain whether it intended to designate a place not traditionally open to assembly and debate as a public forum." *Id.* Although the state is not required to retain the open character of the forum indefinitely, as long as it does, it is bound by the same standards that apply to a traditional public forum which are described above.

■ A final category of public property, not governed by tradition or designation for public communication, is governed by different standards since the "First Amendment does not guarantee access to property simply because it is owned or controlled by the government." *United States Postal Service,* 453 U.S. at 129, 101 S.Ct. at 2685. In addition to time, place and manner regulations, the state may re-

serve the forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's views. *Id.* at 131, n. 7, 101 S.Ct. at 2686 n. 7. As the Court has stated on several occasions, " ' "[t]he state, no less than a private owner of property, has the power to preserve the property under its control for the use to which it is lawfully dedicated." ' " *Id.,* at 129–30, 101 S.Ct. at 2685, *quoting Greer v. Spock,* 424 U.S. 828, 836, 96 S.Ct. 1211, 1217, 47 L.Ed.2d 505 (1976), *in turn quoting Adderley v. Florida,* 385 U.S. 39, 47, 87 S.Ct. 242, 247, 17 L.Ed.2d 149 (1966).

■ A forum does not require a physical situs and therefore, may consist of a method or means of communication as opposed to simply a location of communication. *Cornelius,* 473 U.S. at 801, 105 S.Ct. at 3448.

In this case, the court does not believe that it is necessary for it to determine with certainty the specific type of public forum U.S. Highway 65 in Boone County is, because, in the court's view, it clearly is either a public forum because streets and highways are places which by long tradition have been the situs of assembly and speech or because this highway and other highways in Arkansas have been created by the State of Arkansas, acting through the Arkansas State Highway and Transportation Department, as such a forum through the creation and operation of the Adopt–A–Highway Program.

■ The court believes that highway rights-of-way are traditional public forums. *Frisby v. Schultz,* 487 U.S. 474, 480, 108 S.Ct. 2495, 2500, 101 L.Ed.2d 420 (1988); *Boos v. Barry,* 485 U.S. 312, 318, 108 S.Ct. 1157, 1162, 99 L.Ed.2d 333 (1988); *Cornelius v. NAACP Legal Defense & Educational Fund, Inc.,* 473 U.S. 788, 802, 105 S.Ct. 3439, 3449, 87 L.Ed.2d 567 (1985); *Perry Education Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 45, 103 S.Ct. 948, 954–55, 74 L.Ed.2d 794 (1983); *Hague v. Committee for Industrial Org.,* 307 U.S. 496, 515, 59 S.Ct. 954, 963–64, 83 L.Ed.

1423 (1939). In fact, at least one district court has specifically held that the shoulder of a highway is a traditional public forum on which picketing was allowed. *Jackson v. Markham*, 773 F.Supp. 105 (N.D.Ill. 1991).

It is undeniable that public roads in Arkansas and throughout the nation are used for public speech and for the promotion of various political, religious, social and commercial views. Anyone who travels the highways of this state or this country must know that it is impossible to travel any significant distance on one of our public highways without being confronted with billboard after billboard and other signs promoting almost any view, theory or product. It may be true that many of these billboards and other signs are not technically upon the public right-of-way, but there are other signs which are, such as those which are intended to make certain that the traveling public is aware of which public official or public body claims to be responsible for the fine highways on which the traveler is proceeding so that the traveler will appreciate it and undoubtedly so the traveler will vote for that official or members of that public body claiming to be responsible.

Additionally, in recent times it has become customary for the state to promote and advertise, apparently for the public good, commercial establishments by erecting and maintaining on the highway right of way signs, in color, advising the traveling public that food, lodging, or other services are available along the way, usually including the name, and often the logo or other identifying mark, of the commercial business advertised.

The court believes that it is undeniable that in this day and time that public highway rights-of-way have become places where "speech" of one type or another is engaged in.

However, even if that is not true, and even if one can say that public highways and the public highway right-of-way are not traditional places of public speech, it is unquestionable, in this court's view, that the state has made them such, at least for purposes of allowing and encouraging individuals, groups, and organizations to participate in the Adopt-A-Highway Program in return for, among other things, the opportunity to advertise and promote their views or at least their good name. In this respect, the very policy statement which established the program and encouraged participation assures possible participants that signs will be erected containing the name of the adopting entity and that "news media coverage will be encouraged ... to recognize participating organizations." *supra* at 1430.

Does anyone seriously believe that at least some if not many of the more than 2200 persons, groups, or organizations, who have adopted portions of Arkansas highways prior to December 9, 1991 did not do so, at least in part, because of the sign and the publicity that will come from their participation in the program? Surely not. In fact, it is evident from Chief Counsel Wilson's memorandum of December 9, 1992 to the District Engineer that at least he, as the Department's lawyer, believed that one of the benefits to participants was the good will and promotion received from the placing of the signs naming them. In that memorandum he said: "Because of the Klan's discriminatory practices, it would not be consistent with the aims of the State to spend State funds for signs that would promote the Klan." (emphasis supplied).

Thus, the state has clearly opened for use by the public a place for "speech" through the program. Once having done so, the state may not discriminate against a person, group or organization simply because the state officials, and perhaps most of the citizens of the state, disagree with the views being espoused by a particular organization.

The court also has no doubt but that the individuals, businesses, groups and other organizations participating in the program are engaged in "speech" when they participate. If nothing else, they, by picking up or having their members or employees pick up litter, thus keeping their adopted portion of the highway beautiful and litter free, are saying or hoping to say

to the travelling public by actions and deeds, and through the signs constructed by the State of Arkansas, that they are "good" and environmentally conscious, and thus good citizens and politically and socially correct.

■ Let the court hasten to say that it makes no difference whether this court, or any other court asked to apply and enforce the provisions of our Constitution, agrees or disagrees with the views of those seeking such protection. In *Healy v. James*, 408 U.S. 169, 188, 92 S.Ct. 2338, 2349, 33 L.Ed.2d 266 (1972) the Supreme Court held that speech cannot be restricted simply because one finds certain views "abhorrent." In *Communist Party v. Subversive Activities Control Board*, 367 U.S. 1, 137, 81 S.Ct. 1357, 1432, 6 L.Ed.2d 625 (1961), Mr. Justice Black, in a dissenting opinion, succinctly and vividly described the issue as follows:

> I do not believe that it can be too often repeated that the freedoms of speech, press, petition and assembly guaranteed by the First Amendment must be accorded to the ideas we hate or sooner or later they will be denied to the ideas we cherish.

> Over 200 years ago Voltaire framed the issue before this court in the oft quoted statement: "I disapprove of what you say, but I will defend to death your right to say it." John Bartlett, *Bartlett's Familiar Quotations 344:11* (15th Edition 1980).

In this case, this court recognizes that surely most of us would abhor many of the views espoused by the Klan, some of which are detailed in the issue of the *"White Patriot"* cited above, and detest the Klan and what it stands for, but that is not a basis for this court or for others to prohibit people who apparently do hold that view from speaking what is in their mind irrespective of how twisted some might think that mind to be. If that is permissible, as Justice Black points out, it may very well be that some other majority will someday prevent some of us from speaking what we believe to be the truth, simply because the persons making up that majority at that time, or the public officials who happen to be in power at the time, do not agree with what we say or believe.

■ Content-based regulations, laws and rules are presumptively invalid, as the Court held in *R.A.V. v. St. Paul*, ⸺ U.S. ⸺, ⸺, 112 S.Ct. 2538, 2542, 120 L.Ed.2d 305, (1992), a case which involved a St. Paul, Minnesota, ordinance which prohibited cross-burning and Nazi swastika display and other symbols of intolerance directed toward others based on race, color, creed, religion, or gender.

■ A state may not grant the use of a forum to groups who use it to express popular views, but deny use to those wishing to express views not favored by the public or those officials who presume to represent the public view. A public forum, once open for assembly or speech to some groups, may not prohibit other groups from assembling or speaking simply because their beliefs are not favored by the majority of us. *Police Department of Chicago v. Mosley*, 408 U.S. 92, 96, 92 S.Ct. 2286, 2290, 33 L.Ed.2d 212 (1972).

■ Even if the state was not required to create the forum, once it does, it may not discriminate against groups because of the content of the speech which the group intends to promote in that forum. *Widmar v. Vincent*, 454 U.S. 263, 267, 102 S.Ct. 269, 273, 70 L.Ed.2d 440 (1981).

In the words of now Chief Judge Richard Arnold in a case reversing this court:

> The University need not supply funds to student organizations; but once having decided to do so, it is bound by the First Amendment to act without regard to the content of the ideas being expressed. This means to use Holmes' phrase, that taxpayers will occasionally be obligated to support not only the thought of which they approve, but also the thought they hate. That is one of the fundamental premises of American law.

*Gay and Lesbian Students Ass'n v. Gohn*, 850 F.2d 361, 362 (8th Cir.1988).

■ This court believes that it is clear in this case that the State of Arkansas, even if public highways are non-traditional places for public speech, has, nevertheless, created a public forum on public highways in Arkansas through the Adopt–A–High-

way Program. Once having done so, the state may not deny the Knights of the Ku Klux Klan the right to participate in that program and gain the benefits through publicity and otherwise through such participation simply and solely because, in the words of its counsel, it is an "overtly and patently racially and religiously discriminatory organization" and "would be harmful to the public image of the Adopt-a-Highway program and to the Arkansas Highway and Transportation Department."

Defendants argue that the action that has been taken is, among other things, to promote public safety, apparently because of the claimed belief that the Klan signs will cause demonstrations and counter-demonstrations, increase litter, and endanger travellers and workers on the highway. In the court's view, that is clearly not a sufficient basis for denying any organization its rights guaranteed by the Constitution of the United States, even if that concern is sincere and well-placed. As the court said in *Terminiello v. Chicago*, 337 U.S. 1, 4, 69 S.Ct. 894, 895–96, 93 L.Ed. 1131 (1949):

> [Speech] ... may strike at prejudices and preconceptions and have profound unsettling effects ..., that is why freedom of speech, though not absolute, ... is nevertheless protected against censorship ... unless shown likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest.

The Court of Appeals for the Seventh Circuit in *Collin v. Smith*, 578 F.2d 1197 (7th Cir.1978), *cert. denied*, 439 U.S. 916, 99 S.Ct. 291, 58 L.Ed.2d 264 (1978), was faced with the question of whether the American Nazi Party displaying swastikas and wearing uniforms like those worn by the German Nazi Party, could be prohibited from demonstrating at the Village Hall in the Village of Skokie, Illinois, a town where 40,500 of the town's 70,000 population was Jewish. The court recognized that the public in Skokie would undoubtedly find the demonstration offensive, and for good reason, but ruled, nevertheless, that the First Amendment's guarantee of freedom of speech and association protected the Nazi Party's demonstration. In so ruling, the court said: "[P]ublic intolerance or animos-ity cannot be the basis for abridgement of these constitutional freedoms." *Id.* at 1206, *quoting Coates v. Cincinnati*, 402 U.S. 611, 615, 91 S.Ct. 1686, 1689, 29 L.Ed.2d 214 (1971).

Thus, even if participation in the program by the Klan is likely to engender agitation and disgust in others, and even though others might choose to demonstrate such feelings by organized or spontaneous protests or other actions they choose to take to express their feelings, that is still not sufficient grounds for denying the plaintiffs in this case, and all other citizens of this country, the rights guaranteed by the revered and venerable Constitution of this country written and adopted by our forefathers to protect us all. As Justice Douglas said in *Terminiello*, 337 U.S. at 4, 69 S.Ct. at 895–96:

> The right to speak freely and to promote diversity of ideas and programs is therefore one of the chief distinctions that sets us apart from totalitarian regimes. Accordingly a function of free speech under our system of government is to invite dispute. It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger. Speech is often provocative and challenging. It may strike at prejudices and preconceptions and have profound unsettling effects as it presses for acceptance of an idea. That is why freedom of speech, though note absolute, ... is nevertheless protected against censorship.

That high principle applies whether the ideas promoted are believed by the general public to be "good" or "bad". As already stated, many and perhaps most of our citizens undoubtedly abhor and detest the views expressed by the Klan in various public forums such as the *"White Patriot"* referred to above, but that is no reason to, for the reasons already stated, prevent the Klan from having its say. Our democracy and our right to free speech is premised upon the belief that, in the long run, "truth" and "good" will prevail if each of us has the freedom to discuss and promote what we insist is "truth" and "good", and

**1438**

none of us are prohibited from expressing our beliefs irrespective of how much some of us, or even the majority of us, abhor them.

■ Defendants also argue, in effect, that if the state allows the Klan to enjoy the benefits of our Constitution by treating it like other participants in the Adopt–A–Highway Program, federal highway funds will be lost because the Klan, in exercising its First Amendment right to promote its views, is intolerant of others. Surely, that contention is specious. Surely, a public body which simply abides by the provisions of the Constitution by treating all citizens equally by allowing them to exercise their First Amendment right to freedom of speech, will not be penalized for merely doing what the Constitution commands. There is no indication in the file that the Klan seeks any treatment other than that afforded to all other participants in the program. By allowing the Klan to participate, and by simply placing signs on the highway to signify that it has, just as it does for Wal–Mart, the National Organization for the Reform of Marijuana Laws, and various Baptist churches and literally a couple of a thousand others, is no more an indication of support of the Klan and its racist and other policies of intolerance than participation in the program by NORML and the placing of the sign for that organization indicates that the Arkansas Highway and Transportation Department advocates the legalization of marijuana.

The court will enter a declaratory judgment declaring that the defendants have violated the plaintiffs' constitutional rights and will enjoin and restrain them from denying the plaintiffs the opportunity to participate in the state Adopt–A–Highway Program. Plaintiffs will also recover their costs of this action and reasonable attorney's fees upon application therefor being properly made.

The court has determined that the other relief prayed for in the complaint is not necessary at this time, under the circumstances. Specifically, the plaintiffs contend, and the defendants agree, that in January 1992, after the Klan's application, the Highway Department adopted new guidelines for the program which included the following language:

AHTD reserves the right to deny adoption or renewal request by any group, individual, or business based on any one of the following criteria:

(a) safety of the participants, passing motorists, or AHTD employees;

(b) effectiveness of the litter control by the participants;

(c) harm to the public image of the Adopt–A–Highway Program or AHTD.

The Department denies that the new criteria was adopted as a result of the Klan application, and contends that it already had change under consideration before this incident arose. The court can understand why the defendants are suspicious of that claim since the application by the Klan and the changes are at least temporally related—the application was made in early December, the Chief Counsel's memorandum to the District Engineer was dated December 9, 1992, and the new criteria was subsequently adopted. Be that as it may, the court concludes that the new policy is not unconstitutional, *per se,* so neither a declaration so holding or injunctive relief is warranted. It is certainly possible for the Department to administer the policy as written in a nondiscriminatory and constitutional manner, and this court's holding in this case should encourage it to do so.

### ORDER

On this 2nd day of November 1992, upon consideration of the plaintiffs' motion for summary judgment, the court finds for the reasons set forth in a memorandum opinion of even date that said motion should be and hereby is granted;

FURTHER, it is declared that the Arkansas State Highway and Transportation Department's denial of the application to participate in the Department's Adopt–A–Highway Program submitted by the Knights of the Ku Klux Klan resulted in a violation of 42 U.S.C. § 1983 as an unconstitutional infringement of the plaintiffs' freedoms of speech and assembly protected by the First and Fourteenth Amendments to the United States Constitution.

FURTHER, the Arkansas State Highway and Transportation Department, and its Commissioners, agents and employees who are defendants herein are hereby ordered to accept the application for participation in the Adopt–A–Highway Program submitted by the Knights of the Ku Klux Klan on December 9, 1991, and to allow said organization and its members to participate in such program, without limitation, and upon the same terms and conditions as applied to any other applicants. Defendants will, as soon as possible but not later than 60 days from the date of this order, allow said defendants to adopt the portion of U.S. 65 requested in their application unless said portion is not available and cannot be made available by action of the defendants by such time. In such event, defendants shall be allowed to "adopt" any other portion of said highway or other highway as may be acceptable to defendants.

FURTHER, the defendants are enjoined from any further violations of the plaintiffs' rights or the rights of others similarly situated;

IT IS FURTHER ORDERED, that plaintiffs shall recover from defendants, jointly and severally, their costs and expenses, including a reasonable attorney's fee upon application being made therefor within the time and in the manner provided by Rule 27 of the Rules of the United States District Court for the Eastern and Western Districts of Arkansas.

This matter is hereby dismissed and terminated; provided, however, that the court shall retain jurisdiction of this matter to enforce its orders entered herein and shall be subject to being re-opened upon application of either party for good cause shown.

IT IS SO ORDERED.