927 F.Supp. 1248 (1996)
STATE OF MISSOURI, ex rel., MISSOURI HIGHWAY AND TRANSPORTATION COMMISSION, Plaintiff,
v.
Michael CUFFLEY and the Knights of the Ku Klux Klan, Defendants.
No. 4:94CV1264 (MLM).
United States District Court, E.D. Missouri, Eastern Division.
June 11, 1996.
*1249 *1250 *1251 Curtis F. Thompson, Marci L. Horton, Missouri Highway and Transportation Commission, Jefferson City, MO, Richard B. Regan, Missouri Highway and Transportation Commission, Chesterfield, MO, for plaintiff.
Robert Herman, Partner, Schwartz and Herman, St. Louis, MO, for defendants.

MEMORANDUM AND ORDER
MEDLER, United States Magistrate Judge.
This case is before the Court on the complaint which the Missouri State Highway Transportation Commission ("Commission") has filed against Michael Cuffley and the Knights of the Ku Klux Klan ("the Klan") seeking a declaratory judgment that the Commission does not have to accept the Klan's application to participate in the Missouri "Adopt-A-Highway Program." Presently pending before the Court are: (1) the Commission's motion for summary judgment [18]; and (2) the Klan's cross-motion for summary judgment [16]. The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).

I.

SUMMARY JUDGMENT STANDARDS
Courts have recognized that summary judgment is a remedy which the courts should only grant when the moving party has established his right to judgment with such clarity as not to give rise to controversy. City of Mt. Pleasant, Iowa v. Assoc. Elec. Co-op., Inc., 838 F.2d 268 (8th Cir.1988). Summary judgment motions, however, "can be a tool of great utility in removing factually insubstantial cases from crowded dockets, freeing courts' trial time for those that really do raise genuine issues of material fact." Id. Pursuant to Federal Rule of Civil Procedure 56(c), a district court may grant a motion for summary judgment if all the information before it shows that "there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law." Poller v. Columbia Broadcasting System, 368 U.S. 464, 467, 82 S.Ct. 486, 488, 7 L.Ed.2d 458 (1962). With these principles in mind the Court turns to an examination of the facts and finds that the material facts are undisputed.

II.

STATEMENT OF UNDISPUTED FACTS
The Missouri Highway and Transportation Commission is responsible for the location, design and maintenance of all state highways within the State of Missouri. In furtherance of its continuing maintenance of the state highway system, the Commission has established an Adopt-A-Highway Program, which is a voluntary program enacted to promote litter control and to reduce the costs of litter *1252 abatement to the Commission. Participants in the Adopt-A-Highway Program conduct activities to help control litter along state highway rights-of-way. These activities minimize the expenditure of public funds for litter control.
"[A]ny person, organization, club or governmental agency" may join to clean or maintain a designated portion of state highway. The Commission makes no distinction between participation by individuals and groups, not-for-profit and for-profit and secular and religious organizations. The Commission also allows political organizations to participate in the Program. In return, the participants receive recognition for their efforts through a sign provided by the Commission acknowledging the identity of the group providing the work. The highway sign bears only the name of the Program participant. The Commission allows no symbols, logos, advertising or other statements on the signs.
The Commission recognizes that many of the groups participating in the Program are motivated to participate in the Program by the desire for publicity or "free advertising," in the case of commercial organizations; recognition of their views in the case of political or social organizations; and even the desire to proselytize for new members, in the case of religious organizations. The Commission has no objection to these mixed motives.
There are no formal written administrative regulations that govern the Adopt-A-Highway Program. There is an informal "internal letter" which provides general guidelines for the Program. However, this letter does not specify any procedures, does not restrict participation in the Program in any manner, does not set minimum qualifications for the individuals or organizations participating in the Program and does not provide any review procedure to be utilized when applications are denied. The Commission approves the overwhelming majority of applications without review and the applications which the Commission does review are on a case-by-case basis and only if the applicant seems "sensitive" or out of the ordinary.
The application process begins when the prospective applicant contacts the local highway department office and requests availability of highway locations. The local office then advises the applicant which locations are available and the applicant decides on a location, submitting a form provided by the Commission. The local office then forwards the completed application form to the main Commission office in Jefferson City, Missouri, which then orders the appropriate sign bearing the name of the adopter. Normally, the entire procedure takes approximately four to six weeks.
In the past, the Commission has given "careful consideration" or "special treatment" to groups where the Commission perceived that the applicant's name or beliefs were a cause for concern due to the "controversial nature of the group." The Commission cites groups such as a gay and lesbian awareness group and the "Environmental Witches" as being applications which were referred for special review treatment. Nevertheless, the Commission ultimately approved these applicants and allowed them to adopt a highway. The Commission did ask a group named "Truckin' Seduction" to reconsider its application on the grounds that its name was sexually suggestive, but the group withdrew its application and never reapplied.
The Commission asserts the right to review on a case-by-case basis and eliminate from participation in the Program, groups whose beliefs and views are unacceptable to the Commission. The measure of acceptability of a group is solely within the discretion of the Commission officials. The Commission provides no regulations which prohibit participation in the Program on the grounds that the applicant discriminates against persons on the basis of race, sex, creed or color.
On May 31, 1994, Michael Cuffley, as the "Unit Recruiter" of the Knights of the Ku Klux Klan, filed an application to participate in the Adopt-A-Highway Program by adopting a portion of a state highway right-of-way. The application for adoption designated as the portion to be adopted I-55 between Utah and Gasconade, a one half mile stretch of interstate highway within the City of St. Louis. The Klan properly completed and filed its application with the St. Louis local Highway Department office and did nothing in the application process out of the ordinary. *1253 The Klan's application was referred to the Commission which, in turn, voted in a special meeting to refer the matter for litigation as a means of securing the Commission's right to deny the Klan's participation in the Program. As of this date, the Commission has taken no action on the application.
The State of Missouri has adopted an ethnic intimidation statute. Mo.Rev.Stat. §§ 574.090-.093 (1993). The Governor of the State of Missouri issued Executive Order 94-03 which states in Article VII that:
[n]o State facility shall be used to promote any discriminatory practice, nor shall any department become a party to any agreement which permits discriminatory practice prohibited by this order, state or federal law.
The school districts of the City of St. Louis and St. Louis County have been ordered to desegregate their respective school districts. The District Court for the Eastern District of Missouri maintains jurisdiction over the school desegregation matter and enters orders as appropriate. Desegregation efforts include the Voluntary Interdistrict Busing Program. The section of the highway that is on the application received by the Commission from the Klan is one of the routes used by busses transporting African-American students from St. Louis City to and from county schools as part of the desegregation efforts.
The Commission is a recipient of federal aid funds through the Federal Highway Administration. The Federal Highway Administration issued an opinion on September 2, 1992 requiring the activities of all recipients of federal funds to comply with all applicable non-discrimination statutes.
Although there are numerous organizations that use the name "Ku Klux Klan" in their title, the Defendant Klan traces its origin to the original Ku Klux Klan founded by General Bedford Forrest following the end of the Civil War. The Klan has organizations in each of the fifty states. Mr. Cuffley was the unit coordinator for the Klan, Missouri Realm, at the time of the application to adopt and was the highest ranking official of the Missouri organization at that time. Federal courts have taken judicial notice of the history of the Klan groups and the history of violence, racial hatred and bigotry of these groups. See McMullen v. Carson, 754 F.2d 936, 938 (11th Cir.1985); Marshall v. Bramer, 110 F.R.D. 232, 235 (W.D.Ky. 1985).

III.

ANALYSIS
The First Amendment guarantees freedom of speech.[1] "[T]he protection granted by the First Amendment is not limited to verbal utterances but extends as well to expressive conduct." Spence v. Washington, 418 U.S. 405, 94 S.Ct. 2727, 41 L.Ed.2d 842 (1974). Moreover, the freedom of speech protected by the First Amendment, though not absolute, "includes both the right to speak freely and the right to refrain from speaking at all." Wooley v. Maynard, 430 U.S. 705, 714, 97 S.Ct. 1428, 1435, 51 L.Ed.2d 752 (1977).
Even protected speech, however, is not equally permissible in all places and at all times. Cornelius v. NAACP Legal Defense and Educational Fund, Inc., 473 U.S. 788, 799, 105 S.Ct. 3439, 3447, 87 L.Ed.2d 567 (1985). For instance, the First Amendment does not guarantee unlimited access to government-owned property for purposes of expression:
Nothing in the Constitution requires the Government freely to grant access to all who wish to exercise their right to free speech on every type of Government property without regard to the nature of the property or to the disruption that might be caused by the speaker's activities. [citation omitted] Recognizing that the Government, "no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated," [citation omitted] the Court has adopted a forum analysis as a means of determining when the Government's *1254 interest in limiting the use of its property to its intended purpose outweighs the interest of those wishing to use the property for other purposes.
Cornelius, 473 U.S. at 799-800, 105 S.Ct. at 3447-3448.
In Cornelius, the Supreme Court held that the determination of whether the right to speak on government property has been abridged involves three discrete steps. First, the court must determine whether the conduct in question is "speech" protected by the First Amendment. If the court determines that protectible "speech" is involved, it must next identify the nature of the forum, because the extent to which the government may limit access depends on whether the forum is public or nonpublic. Finally, the court must assess whether the justifications for the exclusion from the relevant forum satisfy the requisite standard. Cornelius, 473 U.S. at 797, 105 S.Ct. at 3446.

A. Speech
The Supreme Court has explained that conduct is protected by the First Amendment only if it is "sufficiently imbued with elements of communication." Spence v. Washington, 418 U.S. 405, 94 S.Ct. 2727, 41 L.Ed.2d 842 (1974). Specifically, the actor must have "[a]n intent to convey a particularized message ... and in the surrounding circumstances the likelihood [must be] great that the message would be understood by those who viewed it." Spence, 418 U.S. at 410-411, 94 S.Ct. at 2730. Thus, when determining whether conduct is expressive for First Amendment purposes, there must exist both an intent to convey a particularized message and a great likelihood that this message will be understood. In deciding whether conduct is expressive, the Court must look to the nature of the activity in conjunction with the factual context and environment in which it is undertaken. Id. See also Texas v. Johnson, 491 U.S. 397, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989).
In Knights of Ku Klux Klan v. Arkansas State Highway and Transportation Department, 807 F.Supp. 1427 (W.D.Ark.1992), the Western District of Arkansas was faced with the issue of whether the Klan had a First Amendment Right to participate in the Arkansas Adopt-A-Highway program. The Western District of Arkansas concluded that the Klan's participation in the program was "speech" protected by the First Amendment. Specifically, the district court found that the participants in the program are engaged in speech because the participants intend to and do convey to the traveling public, through their actions and deeds of picking up litter and maintaining a litter-free portion of the highway, that they are "environmentally conscious" and "politically and socially correct" citizens of the State of Arkansas. Knights of Ku Klux Klan, 807 F.Supp. at 1435-1436.[2]
Like the Arkansas District Court, this Court finds that the Klan's desired participation in the Missouri Adopt-A-Highway Program is "speech" protected by the First Amendment. The Court agrees with the Western District of Arkansas that participants in the Adopt-A-Highway Program have an intent to convey a particularized message to the traveling public by adopting a particular portion of the highway. Specifically, the Court finds that the message intended to be conveyed by the participants is that *1255 they are environmentally-conscious and altruistic contributors to their community. Furthermore, the Court finds that in the surrounding circumstances, the likelihood is great that the message intended to be conveyed by participants is understood by those travelers who view it. Specifically, the Court believes that travelers on the state highways do believe that individuals who are picking up litter along the highways are environmentally-conscious and altruistic contributors to our community. Spence, 418 U.S. at 410-411, 94 S.Ct. at 2730-2731.
The Commission argues that to the extent any "speech" is occurring within the Missouri Adopt-A-Highway Program, it is the Commission that is speaking. The Commission argues that it, and not the program participants, is responsible for erecting the sign at either end of the adopted stretch of highway and that the participants have no control over the sign's content or format and may not include any independent message on it. The Court rejects the Commission's argument.
The undisputed facts in this case are that when an organization decides to participate in the Missouri Adopt-A-Highway Program, it does so ostensibly for two reasons: first, to clean the state's highways and, second, (and more importantly from the organization's perspective) to portray itself as an environmentally-conscious and altruistic contributor to its community. The fact that the participants are rewarded with a sign erected by the State is only a part of the entire message that the participants seek to convey.[3] It is the picking up of litter which conveys the message to the traveling public, as opposed to the sign. The sign merely identifies the speaker.[4]
The Court therefore rejects the Commission's argument that any "speech" involved here is the "speech" of the Commission. Instead, the Court finds that the "speech" at issue here is the speech of the Klan and is protected under the First Amendment of the United States Constitution.

B. Forum
Having determined that the Klan's desired participation in the Adopt-A-Highway Program is protected speech under the First Amendment, the Court must next determine the nature of the forum, for even protected speech is not equally permissible in all places at all times. Cornelius, 473 U.S. at 799, 105 S.Ct. at 3447. "The right to use government property for one's private expression depends upon whether the property has by law or tradition been given the status of a public forum, or rather has been reserved for specific official uses." Capitol Square Review & Advisory Bd. v. Pinette, ___ U.S. ___, ___, 115 S.Ct. 2440, 2446, 132 L.Ed.2d 650 (1995) (citing Cornelius, 473 U.S. at 802-03, 105 S.Ct. at 3449). Thus, the second step of the Cornelius test requires the classification of the nature of the forum to ascertain the extent to which the government may limit access thereto. Van Bergen v. Minnesota, 59 F.3d 1541, 1551 (8th Cir. 1995) ("the standards by which limitations on speech must be evaluated differ depending on the character of the property at issue").
In Perry Education Association v. Perry Local Educators' Association, 460 U.S. 37, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983), the Supreme Court noted that three categories of public property have been recognized. The first category is the "traditional public forum," such as the town square, which is a forum "which by long tradition or by government fiat ha[s] been devoted to assembly and debate." Perry, 460 U.S. at 45, 103 S.Ct. at 954. See also Forbes v. Arkansas Educational Television Communication Network Foundation, 22 F.3d 1423, 1429 (8th Cir.), cert. denied ___ U.S. ___, 115 S.Ct. 500, 130 L.Ed.2d 409 (1994). Examples of traditional public fora include streets, parks and public *1256 sidewalks which have "immemorially been held in trust for the use of the public and, time out of mind, `have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions.'" Perry, 460 U.S. at 45, 103 S.Ct. at 954-955 (quoting Hague v. CIO, 307 U.S. 496, 515, 59 S.Ct. 954, 964, 83 L.Ed. 1423 (1939)).
The second category of government property is the "designated public forum." This is public property that the state has opened to the public for expressive activity. Perry, 460 U.S. at 45, 103 S.Ct. at 955. This category of property may be opened generally for all expressive activity. See Southeastern Promotions, Ltd. v. Conrad, 420 U.S. 546, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975). Or, it may be designated for more limited purposes such as use by certain groups, see Widmar v. Vincent, 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981), or discussion of certain subjects, see City of Madison, Joint School District No. 8 v. Wisconsin Employment Relations Comm'n, 429 U.S. 167, 97 S.Ct. 421, 50 L.Ed.2d 376 (1976), or for a limited period of time. Forbes, 22 F.3d at 1429.[5] University meeting facilities, Widmar, supra, a municipal theater, Southeastern Promotions, supra, and school board meetings, Madison Joint School District, supra, for example, have been held to fall within this second category of "designated public forum."
The third category is the "non-public forum" which is public property which is not by tradition or designation a forum for public communication. It consists of property usually incompatible with expressive activity. Where the principal function of such property would be disrupted by expressive activity, the Supreme Court has generally held that the government did not intend to create a public forum and the forum is, instead, non-public. Cornelius, 473 U.S. at 803-804, 105 S.Ct. at 3449-3450; Forbes, 22 F.3d at 1429. Examples of a "non-public forum" include prisons, Adderley v. Florida, 385 U.S. 39, 87 S.Ct. 242, 17 L.Ed.2d 149 (1966), military reservations, Greer v. Spock, 424 U.S. 828, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976) and a school district's internal mail system. Perry, 460 U.S. 37, 103 S.Ct. 948.
In the Arkansas Adopt-A-Highway case, the Arkansas District Court concluded that highway rights-of-way are traditional public fora. The court reasoned that "[i]t is undeniable that public roads . . . are used for public speech and for the promotion of various political, religious, social and commercial views," and that "public highway rights-of-way have become places where `speech' of one type or another is engaged in." Knights of the Ku Klux Klan, 807 F.Supp. at 1435.[6]
The Texas District Court concurred with the Arkansas court that highway rights-of-way could be a traditional public forum. However, the court also noted that the forum could also be classified as a designated public forum. The court found that it was immaterial whether the forum was a traditional public forum or a designated public forum, noting that "it [is not] necessary . . . to determine with any certainty the specific type of public forum being used; both are bound by the same standard." State of Texas, 853 F.Supp. at 959.
The Fifth Circuit Court of Appeals reached a different conclusion than that reached by both the Arkansas and Texas District Courts:
In pinpointing the relevant forum, we must focus on the "access sought by the speaker." [Cornelius v. NAACP Legal Defense and Educ. Fund, Inc., 473 U.S. 788, 800, 105 S.Ct. 3439, 3448, 87 L.Ed.2d 567 (1985) (quoting Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 45, 103 S.Ct. 948, 955, 74 L.Ed.2d 794 (1983))]. We *1257 employ a "tailored approach" in determining what constitutes the forum within the confines of government property. Id. In Cornelius, the government wished to exclude certain groups from participating in a charitable fundraising drive conducted in the federal workplace. The Supreme Court defined the forum as the fundraising campaign rather than the government buildings which housed federal workers. Id. In Perry Educ. Ass'n, the Court defined the forum as the internal mail system of a public school rather than the school property. 460 U.S. at 44, 103 S.Ct. at 954; see also Lehman v. City of Shaker Heights, 418 U.S. 298, 302, 94 S.Ct. 2714, 2717, 41 L.Ed.2d 770 (1974) (defining forum as advertising spaces on the buses). Similarly, we define the forum in this case as the Program rather than the public highways. The Klan does not seek general access to the public highways for speech purposes or even for litter retrieval purposes. Rather, by participation in the Program, the Klan wishes to put its members on the highway under the auspices of the State and get its name on a sign at a particular location.
Texas v. Knights of the Ku Klux Klan, 58 F.3d 1075, 1078 (5th Cir.1995).
This Court must disagree with the Arkansas District Court, for the Court does not find that a state highway right-of-way constitutes a forum which has been "devoted to assembly and debate" or which has been used for "purposes of assembly, communicating thoughts between citizens, and discussing public questions." Perry, 460 U.S. at 45, 103 S.Ct. at 954-955. The Court agrees with the Commission that it is difficult to imagine a location less suited for an exchange of ideas than the shoulder of an interstate highway. The forum here is not the traditional park or street corner where people routinely convene to exchange ideas, but instead four, six or eight-lane highways with vehicles often traveling in excess of fifty-five miles an hour. People have never traditionally convened on highway rights-of-way to exchange ideas. Indeed, the only communication which takes place on such rights-of-way are state highway signs aiding travelers, such as speed limit signs, food and lodging signs and signs indicating rest stops, all of which "give specific information of interest to the traveling public." Mo.Rev.Stat. § 226.535 (1986). Even commercial advertising in Missouri is prohibited within six hundred sixty feet of the nearest edge of the highway right-of-way. Mo.Rev.Stat. § 226.520. Thus, clearly, the state highway right-of-way cannot be characterized as a traditional public forum.
This Court also cannot concur in the conclusion reached by the Fifth Circuit Court of Appeals. The Fifth Circuit's determination that the forum is the Adopt-A-Highway Program itself and thus is a non-public forum, while initially persuasive, hinged on the fact that the Fifth Circuit believed that the participants in the program did not seek general access to the public highways for speech purposes or for litter retrieval purposes. Instead, the Fifth Circuit found that participants wished only to put its members on the highway under the auspices of the State.
The findings of this Court, however, are that, at least in the State of Missouri, the very two purposes for which organizations participate in the Program are: (1) to pick up litter; and (2) to seek general access to the public highways for speech purposes; specifically, to express to the highway travelers that they are environmentally-conscious and altruistic contributors to the community. Contrary to the finding of the Fifth Circuit, the purpose of the participants in the Adopt-A-Highway Program, at least in the State of Missouri, is not to put its members on the highway under the auspices of the State. In fact, this Court does not find that to be a message either conveyed by the participants or understood by the traveling public.
Instead, this Court finds that the forum is most likely a limited or designated public forum. The Court finds that the Missouri Highway Transportation Commission made a decision when it created the Adopt-A-Highway Program to open state highway rights-of-way for the limited purpose of litter retrieval and its associated speech. Forbes, 22 F.3d at 1429. Specifically, the Commission opened state highway rights-of-way, but limited the expressive activity to certain kinds of speech; i.e., the picking up of litter and the attendant expression that the participants are environmentally-conscious and altruistic *1258 contributors to the community. The Commission does not allow any speech other than this in its Program. Travis v. Owego-Apalachin School Dist., 927 F.2d 688, 692 (2d Cir.1991).
The relevant forum is defined by focusing on the "access sought by the speaker." Cornelius, 473 U.S. at 801, 105 S.Ct. at 3448. Contrary to the holding by the Fifth Circuit in its Klan/Adopt-A-Highway case, the Court finds that the access sought by the Klan in this case is not the Program itself. Instead, the Klan seeks access to the highway right-of-way where it can convey its message to the traveling public that it is an environmentally-conscious and altruistic organization. The fact that the Program is the mechanism which permits the Klan access to the highway right-of-way in order to convey its message to the public does not cause the Program to be the forum as opposed to the highway right-of-way.
Irrespective of the above discussion, however, as discussed below the issue of which type of forum is present is immaterial. Under each of the standards applicable to the various fora, the Commission's attempt to exclude the Klan from participation in the Missouri Adopt-A-Highway Program violates the First Amendment of the United States Constitution.

C. Forum Regulation
The extent to which the state may regulate access to a forum hinges upon the court's characterization of that forum. Cornelius, 473 U.S. at 800, 105 S.Ct. at 3447-3448. In traditional public fora, a government's ability to regulate communicative activity is quite limited because the purpose of that forum is the free exchange of ideas. With respect to content-neutral regulations, the state may regulate the time, place and manner of expression only if such regulations are narrowly tailored to serve a significant governmental interest and leave open ample alternative channels of communication. United States Postal Service v. Council of Greenburgh Civic Ass'ns, 453 U.S. 114, 132, 101 S.Ct. 2676, 2686-2687, 69 L.Ed.2d 517 (1981). Content-based restrictions, however, are subjected to strict scrutiny and it is a rare case in which a restriction survives such scrutiny. Whitton v. City of Gladstone, Missouri, 54 F.3d 1400, 1408 (8th Cir.1995). Indeed, in order for the state to enforce a content-based exclusion, it must show that its regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end. Cornelius, 473 U.S. at 800, 105 S.Ct. at 3447-3448.
Designated public fora may be created for a limited purpose such as use by certain groups or for the discussion of certain subjects. Like traditional public fora, when the government has intentionally designated a place or means of communication as a public forum, speakers cannot be excluded without a compelling governmental interest. Widmar v. Vincent, 454 U.S. 263, 269-70, 102 S.Ct. 269, 274-275, 70 L.Ed.2d 440 (1981). Reasonable time, place and manner regulations are permissible, but are subject to the same requirements as those governing similar regulations pertaining to traditional public fora. Perry, 460 U.S. at 46, 103 S.Ct. at 955-956. "[I]n a limited public forum, government is free to impose a blanket exclusion on certain types of speech, but once it allows expressive activities of a certain genre, it may not selectively deny access for other activities of that genre." Travis, 927 F.2d at 692.
Access to non-public fora are governed by a different standard. Access "can be restricted as long as the restrictions are `reasonable and [are] not an effort to suppress expression merely because public officials oppose the speaker's view.'" Cornelius, 473 U.S. at 800, 105 S.Ct. at 3448 (quoting Perry, 460 U.S. at 46, 103 S.Ct. at 955).
With respect to public property that is not a designated public forum open for indiscriminate public use for communicative purposes, we have said that "[c]ontrol over access to a nonpublic forum can be based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral."
Lamb's Chapel v. Center Moriches Union Free School District, 508 U.S. 384, 392-393, 113 S.Ct. 2141, 2147, 124 L.Ed.2d 352 (1993) (quoting Cornelius, 473 U.S. at 806, 105 S.Ct. at 3451). Thus, in a non-public forum, the government may restrict access if: (1) the *1259 restriction is viewpoint neutral; and (2) the restriction is reasonable. Grossbaum v. Indianapolis-Marion County Building Authority, 63 F.3d 581, 587 (7th Cir.1995).

1. Traditional Public Forum/Designated Public Forum
As stated above, in either a traditional public forum or a designated/limited public forum, a government's ability to regulate speech is quite limited. If the regulation is content-based, then there must exist a compelling governmental interest and the regulation must be narrowly tailored to meet that interest.
Here, there is no dispute that the desire on the part of the Commission to exclude the Klan is content-based. Indeed, the Commission concedes this point repeatedly throughout its motion for summary judgment:
[The Commission] does not want to be associated with [the Klan's] beliefs or values, nor does it wish to appear to be conferring a benefit to this organization by expending its resources to erect a sign with the Klan's name on it.
Commission's motion for summary judgment, pg. 19.
[The Commission] has done nothing to prohibit [the Klan] from saying what they please. . . . [The Commission] merely wants to avoid association with the [Klan] on [the Commission's] signs which are displayed on [the Commission's] property.
Commission's motion for summary judgment, pg. 21.
[The Commission] is ardent in its desire to avoid supporting [the Klan], and is equally ardent in its desire to avoid being perceived as supporting [the Klan].
Commission's motion for summary judgment, pg. 22.
[The Commission] has no desire to insinuate itself into a position of interdependence with [the Klan] by erecting a sign along its publicly owned right-of-way acknowledging the Knights of the Ku Klux Klan.
Commission's motion for summary judgment, pg. 24.
Knights of the Ku Klux Klan is subject to instant, offensive name recognition. [The Commission] seeks to avoid the taint of this instant recognition by choosing not to acknowledge the Knights of the Ku Klux Klan as a participant in the Adopt-A-Highway Program.
Commission's motion for summary judgment, pg. 35.
The Commission does not dispute that its determination to exclude the Klan from participation in the Missouri Adopt-A-Highway Program is based purely on what the Klan stands for and, thus, is content-based. Instead, the Commission argues that there exist compelling governmental interests in excluding the Klan from the Program.
First, the Commission argues that Klan participation in the Adopt-A-Highway Program will invoke a hostile outward reaction from society at large. This argument, however, has been repeatedly and firmly rejected by the Supreme Court. Free and open debate over matters of controversy has long been regarded as necessary to the functioning of this Country's constitutional system. The Constitution mandates the toleration of speech over its suppression:
Any restriction on expressive activity because of its content would completely undercut the "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wise-open."
Police Dept. of Chicago v. Mosley, 408 U.S. 92, 95-96, 92 S.Ct. 2286, 2290, 33 L.Ed.2d 212 (1972) (quoting New York Times Co. v. Sullivan, 376 U.S. 254, 270, 84 S.Ct. 710, 721, 11 L.Ed.2d 686 (1964)). Supreme Court precedents recognize "that a principal `function of free speech under our system of government is to invite dispute. It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger.'" Texas v. Johnson, 491 U.S. 397, 408-09, 109 S.Ct. 2533, 2542, 105 L.Ed.2d 342 (1989) (quoting Terminiello v. Chicago, 337 U.S. 1, 4, 69 S.Ct. 894, 93 L.Ed. 1131 (1949)).
In Terminiello v. Chicago, the Supreme Court stated:
Speech is often provocative and challenging. It may strike at prejudices and preconceptions and have profound unsettling effects as it presses for acceptance of an *1260 idea. That is why freedom of speech, though not absolute . . . is nevertheless protected against censorship or punishment, unless shown likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest.
Terminiello, 337 U.S. at 4, 69 S.Ct. at 896.
The District Court of Arkansas found that the high principles set forth in Terminiello, supra, apply regardless of whether the ideas promoted by the Klan are believed by the public to be "good" or "bad":
[E]ven if participation in the program by the Klan is likely to engender agitation and disgust in others, and even though others might choose to demonstrate such feelings by organized or spontaneous protests or other actions they choose to take to express their feelings, that is still not sufficient grounds for denying the plaintiffs in this case, and all other citizens of this country, the rights guaranteed by the revered and venerable Constitution of this country written and adopted by our forefathers to protect us all.
Knights of the Ku Klux Klan, 807 F.Supp. at 1437-38.
There is no doubt that, with few exceptions, the citizens of this Country find the tenets promulgated and perpetuated by the Klan to be odious and loathsome. Indeed, the Klan is one of those unfortunate organizations to which even the briefest exposure, such as passing a highway sign with the Klan's name on it, leaves the exposed public with a pervasive sense of repugnance that is often hard to shake. The fact of the matter is that the views expressed by the Klan are wholly reprehensible. Having said that, however, the fact of the matter is also that the Klan is permitted to espouse those reprehensible views irrespective of the disgust such views engender in the majority of the citizens of the United States. And that is because the Constitution of the United States, which governs and protects us all, permits it:
The constitutional right of free expression is powerful medicine in a society as diverse and populous as ours. It is designed and intended to remove governmental restraints from the arena of public discussion, putting the decision as to what views shall be voiced largely into the hands of each of us, in the hope that the use of such freedom will ultimately produce a more capable citizenry and more perfect polity and in the belief that no other approach would comport with the premise of individual dignity and choice upon which our political system rests.
Cohen v. California, 403 U.S. 15, 24, 91 S.Ct. 1780, 1787-1788, 29 L.Ed.2d 284 (1971).
The Commission next argues that "if [the Commission] granted the Klan's application, it would be contributing to the avowed purposes of the Klan." Specifically, the Commission argues that "[a] sign bearing the words Knights of the Ku Klux Klan" erected at the cost and expense of the [Commission] and with employees of [the Commission] would reinforce the perception that the State of Missouri continues to sponsor racial discrimination." See Commission's Motion for Summary Judgment, pg. 37.
The Supreme Court recently rejected this argument in Capitol Square Review and Advisory Board v. Pinette, ___ U.S. ___, 115 S.Ct. 2440, 132 L.Ed.2d 650 (1995). In Capitol Square, the Advisory Board denied the Klan's application to erect a cross on a stateowned plaza surrounding the Columbus, Ohio Statehouse, which was a facility that was open for all to use. The Advisory Board predicated its denial on the fear that passersby would misconstrue the cross as an official state endorsement of Christianity (and, for all intents and purposes, the Klan). The Supreme Court rejected the state's endorsement argument and held that the State may not, on the claim of misperception of state endorsement, ban or discriminate against speech. Capitol Square, ___ U.S. at ___, 115 S.Ct. at 2450.
As stated by the District Court of Arkansas, by allowing the Klan to participate in the Arkansas Adopt-A-Highway Program (and by placing signs on the highway to signify that it has), just as it did for, among others, the National Organization for the Reform of Marijuana Laws "[was] no more an indication of support of the Klan and its racist and other policies of intolerance than participation in the program by NORML and the placing of the sign for that organization indicates that the Arkansas Highway and Transportation *1261 Department advocates the legalization of marijuana." Knights of the Ku Klux Klan, 807 F.Supp. at 1438. This Court agrees. Allowing the Klan to participate in the Missouri Adopt-A-Highway Program is no more an indication of the State's support of the Klan and the tenets promulgated by the Klan than participation in the program by the gay and lesbian awareness group and various religious organizations indicates that the Commission promotes and advocates homosexuality or particular religious beliefs.
Third, the Commission claims that it is prohibited from permitting the Klan's participation in the highway maintenance program because to do so would be in direct contravention of federal law and jeopardize federal funding to the Missouri Highway and Transportation Commission. The Court finds this argument to be without merit and concurs with the reasoning of the District Court of Arkansas which also soundly rejected this argument:
Defendants also argue, in effect, that if the state allows the Klan to enjoy the benefits of our Constitution by treating it like other participants in the Adopt-A-Highway Program, federal highway funds will be lost because the Klan, in exercising its First Amendment right to promote its views, is intolerant of others. Surely, that contention is specious. Surely, a public body which simply abides by the provisions of the Constitution by treating all citizens equally by allowing them to exercise their First Amendment right to freedom of speech, will not be penalized for merely doing what the Constitution commands.
Knights of the Ku Klux Klan, 807 F.Supp. at 1438.[7]
The final argument offered by the Commission is a variation of the ground relied upon by both the District Court of Texas and the Fifth Circuit Court of Appeals in holding that the Klan could not participate in the Texas Adopt-A-Highway Program. In Texas, the U.S. Department of Housing and Urban Development was required to desegregate federally subsidized housing in thirty-six Texas counties. Among those housing complexes to be desegregated was the 74-unit complex located in Vidor, Texas. The Klan had applied to adopt a specific stretch of Highway 105 in or near Vidor, Texas, or Highway 12 in or near Vidor, Texas. One of the portions of highway which the Klan sought to adopt provided the only means of ingress or egress for the Vidor public housing project.
The court found that: (1) the Klan had engaged in "such virile opposition to the desegregation of the project" that a state court was required to enjoin the Klan from blocking access to the project and from intimidating residents; (2) residents of the project would feel fear and frustration if the Klan were allowed to adopt a highway near the project and the presence of Klan members on the highway in Klan attire picking up trash at the entrance to the project would invite strife and interfere with compliance with court orders; and (3) the Program was being used by the Klan as a subterfuge, allowing the Klan to discourage desegregation of the project by means that it could not openly accomplish. The Texas District Court found that, as a result of the above facts, the State had a compelling state interest which outweighed the Klan's First Amendment right to participate in the adopt-a-highway program in or near Vidor, Texas. State of Texas, 853 F.Supp. at 960.[8]
The Commission in the instant case has fashioned an argument similar to that relied upon by the Texas District Court. Here, the Commission argues that allowing the Klan to *1262 adopt the highway along I-55 under the aegis of the State would substantially obstruct desegregation efforts for the City of St. Louis school system and impede the government's ability to comply with court orders in an already volatile area. The Commission argues:
The KKKK, Missouri Realm wishes to do what its sister organization in Texas has attempted. It wishes to intimidate the black students riding the buses on I-55 in order to subvert the voluntary busing program just as the Texas KKKK tried to intimidate black residents of Vidor to prevent the desegregation efforts of that court.
Commission's motion for summary judgment, pg. 39.
This Court finds, however, unlike the Texas case, that permitting the Klan to participate in the Adopt-A-Highway Program will not threaten the school desegregation anywhere near the degree to which the Klan's participation in the Texas Program threatened desegregation of the Vidor housing complex and does not, as a result, constitute a compelling interest. Unlike the Texas case, there is no evidence before the Court that the Klan lodged "virile" opposition to the Court's school desegregation order. Moreover, there is no credible evidence that the adoption by the Klan will cause the participants in the school desegregation program to experience fear and frustration, a great deal of anxiety or invite strife or the interference with compliance with court orders."[9]
Unlike the clear evidence in the Texas case, there is also no evidence in this case which establishes that the Missouri Adopt-A-Highway Program is being used by the Klan as a subterfuge to discourage the school desegregation program. Indeed, there is no nexus between the school desegregation program and the Klan's application at all. Finally, unlike the clear evidence in the Texas case, there is no evidence here that the Klan is attempting to use the Program as a "platform for launching a program of intimidation" or "as a means of inciting tension and possibly even violence." State of Texas, 58 F.3d at 1079. Indeed, the evidence supports only a conclusion that the Klan desires to promote the purposes of the Program, which is to encourage the removal of trash on the highways of Missouri.[10]
*1263 In light of the lack of a relationship between the Klan's application to the Missouri Program and the school desegregation program, the Court cannot reach the same conclusion as the Texas District Court that a "compelling interest" exists.
In sum, specifically with respect to a designated/limited public forum, the Commission was free to impose a blanket exclusion on certain types of speech. In fact, apart from the Adopt-A-Highway Program, the Commission has completely excluded all speech on state highway rights-of-way except for those instructional signs erected for the assistance of travelers. However, once the Commission elected to permit additional speech to take place on the highway rights-of-way, that is, the speech associated with the maintenance of a litter-free highway, the Commission could not exclude anyone who wished to engage in that permitted speech without a compelling governmental interest and a regulation narrowly tailored to accomplish that interest. Here, there is no compelling governmental interest. Therefore, the Commission's efforts to exclude the Klan from participation in the Program must fail.

2. Non-Public Forum
Even assuming that the analysis of the Fifth Circuit Court of Appeals applies equally to this case, and the forum is the Missouri Adopt-A-Highway Program itself, and that the Program is a non-public forum, as opposed to a limited/designated forum, the Commission's efforts to exclude the Klan still remain unconstitutional.
As stated earlier, the non-public forum is governed by different standards. The state may reserve a non-public forum for its intended purposes, communicative or otherwise, so long as the regulation of speech is "reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." Perry, 460 U.S. at 46, 103 S.Ct. at 955. Thus, the regulation must be: (1) reasonable; and (2) viewpoint neutral.
The Supreme Court has recently stated the following with respect to regulation of speech based purely on what the speaker stands for:
It is axiomatic that the government may not regulate speech based on its substantive content of the message it conveys. Police Department of Chicago v. Mosley, 408 U.S. 92, 96, 92 S.Ct. 2286, 2290, 33 L.Ed.2d 212 (1972).... Discrimination against speech because of its message is presumed to be unconstitutional. See Turner Broadcasting System, Inc. v. FCC, 512 U.S. ___, ___, 114 S.Ct. 2445, 2458-2459, 129 L.Ed.2d 497 (1994).... When the government targets not subject matter but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant. See R.A.V. v. St. Paul, 505 U.S. 377, 391, 112 S.Ct. 2538, [2547-2548], 120 L.Ed.2d 305 (1992). Viewpoint discrimination is thus an egregious form of content discrimination. The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction. See Perry Ed. Assn. v. Perry Local Educators' Assn, 460 U.S. 37, 46, 103 S.Ct. 948, 955, 74 L.Ed.2d 794 (1983).
. . . . .
Thus, in determining whether the State is acting to preserve the limits of the forum it has created so that the exclusion of a class of speech is legitimate, we have observed a distinction between, on the one hand, content discrimination, which may be permissible if it preserves the purposes of that limited forum, and, on the other hand, viewpoint discrimination, which is presumed impermissible when directed against speech otherwise within the forum's limitations. See Perry Ed. Assn., supra, at 46, 103 S.Ct. at 955.
Rosenberger v. Rector & Visitors of University of Virginia, ___ U.S. ___, ___ - ___, 115 S.Ct. 2510, 2516-2517, 132 L.Ed.2d 700 (1995). "Although a speaker may be excluded from a nonpublic forum if he wishes to *1264 address a topic not encompassed within the purpose of the forum, or if he is not a member of the class of speakers for whose especial benefit the forum was created, the government violates the First Amendment when it denies access to a speaker solely to suppress the point of view he espouses on an otherwise includible subject." Forbes, 22 F.3d at 1429 (quoting Cornelius v. NAACP Legal Defense & Educ. Fund, 473 U.S. 788, 806, 105 S.Ct. 3439, 3451, 87 L.Ed.2d 567 (1985)).
In this case, the expressive speech attempted by the Klan is the same speech in which the Commission allows every other participant to engage. Thus, the speech attempted by the Klan is speech "otherwise within the forum's limitations." Rosenberger, ___ U.S. at ___, 115 S.Ct. at 2517. In light of that fact that the Klan's speech is identical to every other participant's speech, the exclusion of the Klan by the Commission is based purely on the viewpoint of the Klan. The Commission cannot exclude the Klan based on the specific motivating ideology or the opinion or perspective of the Klan. Perry, 460 U.S. at 46, 103 S.Ct. at 955-956. Indeed, it is undisputed that the Commission violates the First Amendment when it denies access to the Klan solely to suppress the point of view the Klan espouses. Forbes, 22 F.3d at 1429 (quoting Cornelius v. NAACP Legal Defense & Educ. Fund, 473 U.S. 788, 806, 105 S.Ct. 3439, 3451, 87 L.Ed.2d 567 (1985)). Therefore, even assuming that the Adopt-A-Highway Program is a non-public forum, the Commission has violated the Klan's First Amendment rights.
Not only is the Commission's exclusion of the Klan from the Program viewpoint based, but the Commission's exclusion of the Klan is not "reasonable." In the Texas case, the Fifth Circuit found that the State of Texas' decision not to allow the Klan to participate was a "reasonable restriction" on the Klan's speech:
The Program was not meant to be used as a platform for launching a program of intimidation, nor as a means of inciting tension and possibly even violence. Use of the Program to thwart a federal court order requiring desegregation is certainly not consistent with its purposes. The State would act reasonably in preventing the use of the Program for such purposes by prohibiting the participation requested by the Klan.
State of Texas, 58 F.3d at 1079. The circumstances in the instant case are different, however, and do not rise to the level of a "reasonable restriction."
First, as discussed early on in this opinion, the speech identified by this Court differs from the speech identified by the Texas Courts. In Texas, the courts determined that the speech at issue was the attempt "to intimidate minority residents and prospective residents of the Vidor housing complex, thereby disrupting any desegregation of the Vidor housing complex." State of Texas, 853 F.Supp. at 959. Here, however, there is no such evidence. Instead, the evidence supports the Court's conclusion that the speech is the expression that the participants in the Program are environmentally-conscious and altruistic contributors to the community.
Second, there is no evidence that the Klan is using the Program to thwart federally-ordered desegregation of the St. Louis schools. The persuasive facts before the Texas courts are not present here. Thus, on the facts before this Court, the reasons offered by the Commission to exclude the Klan do not rise to the level of a "reasonable restriction" on the Klan's First Amendment Right to Speech.
To conclude, in order for the Klan's exclusion from the Program to be constitutional, its exclusion had to be both viewpoint neutral and reasonable. Here, the Commission had failed to establish either prong. Therefore, the efforts of the Commission to exclude the Klan from participation in the Missouri Adopt-A-Highway Program violates the Klan's rights protected by the First Amendment.[11]

*1265 IV.

CONCLUSION
The Court concludes that any decision on the part of the Missouri State Highway Commission to exclude the Klan's participation in the Missouri Adopt-A-Highway Program will be a violation of the Klan's First Amendment right to free speech. In Justice Kennedy's concurring opinion in Texas v. Johnson, 491 U.S. 397, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989), he stated:
The hard fact is that sometimes we must make decisions we do not like. We make them because they are right, right in the sense that the law and the Constitution, as we see them, compel the result. And so great is our commitment to the process that, except in rare cases, we do not pause to express distaste for the result, perhaps for fear of undermining a valued principle that dictates the decision.
Texas, 491 U.S. at 420-421, 109 S.Ct. at 2548.
The hard fact here is that the Court is reaching a conclusion that it does not like. Nonetheless, the Court reaches this conclusion because such a conclusion is indubitably compelled by the First Amendment of the United States Constitution. At the risk of "undermining a valued principle that dictates the decision," the Court resolutely expresses its distaste for this result. Nonetheless:
I do not believe that it can be too often repeated that the freedoms of speech, press, petition and assembly guaranteed by the First Amendment must be accorded to the ideas we hate or sooner or later they will be denied to the ideas we cherish.
Communist Party v. Subversive Activities Control Board, 367 U.S. 1, 137, 81 S.Ct. 1357, 1432, 6 L.Ed.2d 625 (1961) (Black, J., dissenting).
Accordingly,
IT IS HEREBY ORDERED that Plaintiff Missouri State Highway Commission's motion for summary judgment is DENIED. [18]
IT IS FURTHER ORDERED that the motion of Defendants Michael Cuffley and the Knights of the Ku Klux Klan for summary judgment is GRANTED. [16]
IT IS FINALLY ORDERED that declaratory judgment will be entered in favor of Defendants and against Plaintiff in a separate judgment entered this same date.
NOTES
[1] "Congress shall make no law respecting an establishment of religion, or prohibiting the exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." United States Constitution, Amendment I.
[2] In Texas v. Knights of Ku Klux Klan, 853 F.Supp. 958 (E.D.Tex.1994), aff'd 58 F.3d 1075 (5th Cir.1995), the Eastern District of Texas was also faced with the issue of determining whether the Klan had a First Amendment right to participate in the Texas Adopt-A-Highway program. It was the opinion of the District Court that the Klan, by participating in the program, was attempting to intimidate minority residents of a desegregated federal housing complex located adjacent to the stretch of highway the Klan had planned to adopt. Given these circumstances, the court believed the message of the Klan was clearly expressive conduct and was subject to the First Amendment. Texas v. Knights of Ku Klux Klan, 853 F.Supp. at 959.

On appeal, the Fifth Circuit Court of Appeals declined to address the issue of whether protected speech existed. Specifically, the Court noted that "[a]ssuming that the Klan's participation in the Program would constitute speech or expressive conduct protected by the First Amendment, the Program is a nonpublic forum and the Klan's exclusion from the Program is reasonable and viewpoint-neutral." Thus, the Fifth Circuit declined to rule on the issue of speech because, regardless, the Klan was not permitted to participate in the Texas Adopt-A-Highway program. Texas v. Knights of the Ku Klux Klan, 58 F.3d 1075, 1078 (5th Cir.1995).
[3] Indeed, the Commission even acknowledges in its motion for summary judgment that "the sign is incidental to the larger purpose of the program  litter removal." See Commission's motion for summary judgment, pg. 30.
[4] For example, if an adopted portion of the highway is covered with litter and a traveler sees the sign identifying the those people responsible for maintaining that part of the highway, then the sign has merely identified a group which is not environmentally conscious, which is not an altruistic contributor to the community and which does not honor its commitments. Clearly, the sign, in and of itself, cannot be considered the source of speech.
[5] Most courts use the terms "designated public forum" and "limited public forum" interchangeably. See e.g., Grossbaum v. Indianapolis-Marion County Building Authority, 63 F.3d 581 (7th Cir.1995); Forbes v. Arkansas Educational Television Communication Network Foundation, 22 F.3d 1423 (8th Cir.1994). However, in some circuits, a "limited public forum" is recognized as a specific sub-category of the designated public forum. See e.g., Kreimer v. Bureau of Police for Morristown, 958 F.2d 1242 (3rd Cir.1992); Travis v. Owego-Apalachin School District, 927 F.2d 688, 692 (2d Cir.1991).
[6] The District Court later stated that even if public highways are non-traditional places for public speech, the State of Arkansas had created a public forum on public highways in Arkansas through the Adopt-A-Highway Program. Knights of the Ku Klux Klan, 807 F.Supp. at 1436-1437.
[7] The Texas District Court was also faced with this issue and concluded, without analysis, that the Texas Department of Transportation, by granting the Klan's application would be in violation of the Civil Rights Act of 1964 and would be subject to losing federal funding for state highways. This argument supported that court's finding that there was a compelling state interest which outweighed the Klan's First Amendment right to participate in the adopt-a-highway program. State of Texas, 853 F.Supp. at 960. The Court is unpersuaded by the Texas Court's conclusion in light of the lack of accompanying analysis.
[8] The Texas District Court determined that the speech at issue was occurring in either a traditional public or designated public forum. As such, the court proceeded to analyze the case under the strict scrutiny standard, i.e., the need for a compelling governmental interest and a regulation narrowly tailored to meet that interest.
[9] The Commission has offered the report of Moisy Shopper, M.D., to support its argument that adoption by the Klan will have a detrimental impact on the students traveling along that portion of the highway adopted by the Klan. However, the report by Dr. Shopper is based on an interview with only nine individuals (seven students and two parents) and those individuals were selected by the Commission. Moreover, one of the individuals selected by the Commission for the study was a young student whose grandfather was hung by the Klan in 1967 or 1968. As tragic and shocking as this event most certainly was and continues to be for this student and her family, the Court does not believe that this student represents the experiences of the average student or the majority of the students traveling on the busses. For reasons such as these, the Court is not persuaded by the report and does not find it to be credible evidence.
[10] The Texas Courts also found that the residents of the desegregated housing complex were a "captive audience" to the Klan's activities. Here, the Commission attempts to argue, likewise, that the students traveling on the busses are a "captive audience" and are forced to view the highway sign. The Court finds that the students in this case will not be trapped as the residents in the Texas case were. And, indeed, the Court in Cohen v. California, 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971), held that the "captive audience" doctrine is limited to an area of substantial privacy which justifies government regulation:

[T]he mere presumed presence of unwilling listeners or viewers does not serve automatically to justify curtailing all speech capable of giving offense. See, e.g., Organization for a Better Austin v. Keefe, 402 U.S. 415, 91 S.Ct. 1575, 29 L.Ed.2d 1 (1971). While this Court has recognized that government may properly act in many situations to prohibit intrusion into the privacy of the home of unwelcome views and ideas which cannot be totally banned from the public dialogue, e.g., Rowan v. United States Post Office Dept., 397 U.S. 728, 90 S.Ct. 1484, 25 L.Ed.2d 736 (1970), we have at the same time consistently stressed that "we are often `captives' outside the sanctuary of the home and subject to objectionable speech." Id., at 738, 90 S.Ct. at 1491. The ability of government, consonant with the Constitution, to shut off discourse solely to protect others from hearing it is, in other words, dependent upon a showing that substantial privacy interests are being invaded in an essentially intolerable manner. Any broader view of this authority would effectively empower a majority to silence dissidents simply as a matter of personal predilections.
Cohen, 403 U.S. at 21, 91 S.Ct. at 1786. Furthermore, the Supreme Court holds that in public places "the burden normally falls upon the viewer to `avoid further bombardment of [his] sensibilities simply by averting [his] eyes.'" Erznoznik v. Jacksonville, 422 U.S. 205, 210-211, 95 S.Ct. 2268, 2273, 45 L.Ed.2d 125 (1975) (quoting Cohen, 403 U.S. at 21, 91 S.Ct. at 1786). The Court finds, in light of the above, that the Commission's captive audience argument fails.
[11] Because the Court finds that the Klan's First Amendment rights will be violated if not permitted to participate in the Program, the Court need not address the Klan's Equal Protection argument, which is also well-taken. The Equal Protection Clause and the First Amendment are closely intertwined. Under the Equal Protection Clause, like the First Amendment, "government may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express less favored or more controversial views." Police Dept. of Chicago v. Mosley, 408 U.S. 92, 96, 92 S.Ct. 2286, 2290, 33 L.Ed.2d 212 (1972). Specifically:

There is an `equality of status in the field of ideas,' [footnote omitted] and government must afford all points of view an equal opportunity to be heard. Once a forum is opened up to assembly or speaking by some groups, government may not prohibit others from assembling or speaking on the basis of what they intend to say. Selective exclusions from a public forum may not be based on content alone, and may not be justified by reference to content alone.
Guided by these principles, we have frequently condemned such discrimination among different users of the same medium for expression.
Id. at 96, 92 S.Ct. at 2290. As in all equal protection cases, the crucial question is whether there is an appropriate governmental interest suitably furthered by the differential treatment. Id. at 95, 92 S.Ct. at 2289-2290. For the reasons discussed in the body of this opinion, the Court finds that no such appropriate governmental interest exists which would be furthered by the differential treatment accorded to the Klan.