**James Andrew COLEMAN**

v.

**Zell MILLER, Governor of the State of Georgia, and the State of Georgia.**

**Civil No. 1:94–cv–1673–ODE.**

United States District Court,
N.D. Georgia,
Atlanta Division.

Jan. 3, 1996.

Randal Alonzo Mangham, Office of Randal Alonzo Mangham, Atlanta, GA, Bruce S. Harvey, Office of Bruce S. Harvey, Atlanta, GA, Melvin Robinson, Office of Melvin Robinson, Atlanta, GA, Harold Michael Harvey, Office of Harold Michael Harvey, Atlanta, GA, for plaintiff.

James Andrew Coleman, Atlanta, GA, pro se.

Ray Octavio Lerer, Office of State Attorney General, Atlanta, GA, for defendants.

Dietrich W. Oellerich, Jr., Office of Dietrich W. Oellerich, Jr., Hephzibah, GA, James Michael Spence, Office of James Michael Spence, Augusta, GA, William F. Able, phv, Office of William F. Able, Columbia, SC, Proposed Intervenors.

## ORDER

ORINDA D. EVANS, District Judge.

This civil rights action brought under 42 U.S.C. §§ 1983, 2000a, and 1971 is before the court on Defendants' motion for summary judgment. At issue is the constitutionality of the current state flag of Georgia, established by the Georgia General Assembly in 1956

pursuant to O.C.G.A. § 50-3-1. Plaintiff, an African-American citizen, seeks an injunction ordering the immediate removal of the Georgia flag from all state office buildings on the basis that both the legislation establishing the flag and the flag's design are discriminatory and racist in nature.

## I. *FACTUAL AND PROCEDURAL HISTORY*

On March 31, 1995, this court entered an order denying Plaintiff's motion for a preliminary injunction on the basis that Plaintiff had not shown a likelihood of success on the merits. Prior to issuing the order, evidentiary hearings were held on November 21 and December 15, 1994, at which the parties entered exhibits into evidence and presented testimony by way of affidavits and live witnesses. Plaintiff has offered no additional evidence subsequent to the hearings with the

exception of an amendment to his mandatory interrogatories listing the names of witnesses he intends to call at trial.

The following facts are undisputed unless otherwise noted. Because of the importance of the timing of historical incidents leading to the current flag's enactment, the court presents the facts in a strictly sequential manner.

Prior to the year 1879, Georgia had no official state flag. Georgia had flown, however, a number of unofficial flags including the Confederate First National Flag, also known as the "Stars and Bars." Likewise, the Confederacy never formally adopted a flag during the Civil War. Nevertheless, Confederate troops in battle[1] carried a square flag depicting a blue St. Andrew's Cross on a red field.[2] The Confederate battle flag looked as follows:

In 1879, Senator Herman Perry introduced a bill in the Georgia General Assembly pro-

---

**1.** Among the confederate troops was General Nathan Bedford Forrest, founder of the Ku Klux Klan.

**2.** This flag is sometimes mistakenly referred to as the "Stars and Bars." (*See* Testimony of Edwin Jackson, T. 75, November 21, 1994).

**526**

posing that they adopt his proffered design as the first official state flag. 1878–79 Ga. Laws 114. That flag, a variation on the Stars and Bars which was intended to honor the Confederacy, was modified slightly in 1902 to add the State coat of arms. 1902 Ga.Laws 81. The 1902 flag remained the official flag of the State of Georgia until 1956. It looked like this: [3]

The publication of Margaret Mitchell's book *Gone With The Wind* in 1936 and its release as a movie in 1939 generated a wave of interest in southern history and culture throughout the United States.[4] Although this revived interest was particularly evident in the South,[5] there were few concrete manifestations of it until the mid–1950's, at which time interest in Confederate history coalesced with public outcry to desegregation mandates by the United States Supreme Court.

In 1952, the Georgia General Assembly passed a resolution providing that the Confederate memorial on Stone Mountain near

Atlanta, Georgia should be completed. 1952 Ga.Laws 535.

In 1954, the United States Supreme Court decided *Brown v. Board of Education*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), holding that racial segregation in public schools violated the Equal Protection Clause. Later that year, Georgia voters ratified a constitutional amendment allowing parents to withdraw their children from public schools and diverting public money to nonsectarian, segregated private schools.

In January 1955, the Georgia General Assembly passed a resolution urging completion of the Confederate memorial on Stone Mountain, finding that inadequate progress had

**3.** This example contains a variation on the State coat of arms which first appeared in the mid–1920's.

**4.** *See* Testimony of Edwin Jackson, T. 44, December 15, 1994.

**5.** The revived interest in Georgia's Confederate ancestry focused attention on St. Andrew's Cross, a prime symbol of the Confederacy.

been made since the 1952 resolution. 1955 Ga.Laws 5.

In April 1955, John Sammons Bell, counsel to the County Commissioners Association of Georgia and Chairman of the State Democratic Party, presented his idea of redesigning the state flag to the annual conference of County Commissioners. The County Commissioners approved of the design and voted to support his efforts. As is stated in Bell's affidavit, he had been a lifelong student of Confederate military history and a collector of Confederate memorabilia. As such, he stated that he had thoughts of redesigning the flag to incorporate the Confederate battle flag long before the 1950's.

In May 1955, the Supreme Court decided *Brown v. Board of Education,* 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955), which required the desegregation of public schools to proceed "with all deliberate speed." [6] *Id.* at 300, 75 S.Ct. at 756. The Court's decision fomented great controversy and deep emotion in Georgia. Politicians, including Governor Marvin Griffin, advanced a policy of massive resistance to desegregation in response.

In June 1955, Thurgood Marshall came to Atlanta to help organize citizens to attack segregation. Two months later, the Georgia School Board ordered all teachers belonging to the National Association for the Advancement of Colored People to resign from the organization or have their teaching licenses revoked. At approximately the same time, the State Attorney General prepared for distribution to public schools and universities a background paper advocating the doctrine of interposition, which essentially maintains that states may interpose themselves to block the enforcement of unconstitutional federal mandates such as *Brown.* During this time, the Ku Klux Klan displayed the Confederate battle flag.

In September 1955, the United States Postal Service issued a stamp commemorating Robert E. Lee.

In November 1955, the Supreme Court decided *Holmes v. City of Atlanta,* 350 U.S. 879, 76 S.Ct. 141, 100 L.Ed. 776 (1955), which required the desegregation of Atlanta's public golf courses and, by extension, all public facilities, including buses, parks, beaches, and swimming pools.

In December 1955, Rosa Parks refused to give up her seat on a Montgomery, Alabama bus and Rev. Martin Luther King, Jr. instituted a bus boycott there which lasted for over a year. In Georgia, the Board of Regents voted to permit the Georgia Tech football team to play an away game against a team with one black player; however, they also passed a resolution to play no intrastate games against teams with black players.

At the beginning of the 1956 legislative session, Governor Griffin stated in an address to the States' Rights Counsel of Georgia that "the rest of the nation is looking to Georgia for the lead in segregation." In his 1956 state of the State address, Governor Griffin declared that

> there will be no mixing of the races in public schools, in college classrooms in Georgia as long as I am the governor. I campaigned with segregation as the number one plank in my platform. We must not desert future generations of Georgians. We must never surrender. All attempts to mix the races, whether they be in the classrooms, on the playgrounds, in public conveyances, or in any other close personal contact on terms of equality harrow the mores of the South.

The General Assembly had no African–American members at that time.

In early February 1956, Senator Willis Hardin sponsored a bill to adopt John Sammons Bell's new design for the state flag. The bill passed in the Senate within three days. The only discussion on its adoption involved the Civil War centennial and the fact that few surviving Confederate veterans remained to participate. In the House, members debated the cost of changing the flag and whether Bell owned a copyright on

---

**6.** Although the Supreme Court declared in *Brown v. Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954) that segregating public school children on the basis of race was unconstitutional, it ordered the case restored to the docket for further argument on the issue of how to formulate the desegregation decrees. The second *Brown v. Board of Education* decision, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955), dealt with this question.

his design such that he would profit from the change. The United Daughters of the Confederacy opposed changing the flag, arguing that the Confederate battle flag belonged to all Southerners and no single state had the right to appropriate it.

The bill passed 107 to 32 with 61 abstentions.[7] Because of the unusually high number of abstentions, the bill passed by only a fourteen-vote margin. The flag adopted in 1956, which today remains the official flag of Georgia, looks like this:

Nothing in the record of the flag bill's debate reveals discussions of segregation or white supremacy. This is pointed out in a number of affidavits of former legislators. (*See, e.g.,* affidavits of S. Ernest Vandiver, Jr., Carl E. Sanders, Harold L. Murphy, Denmark Groover, Jr., and Robert G. Stephens, Jr.). One former member, James Mackay, however, testified that the flag was adopted as a symbol of resistance to *Brown.*

The remainder of the 1956 session of the General Assembly reflected its members' interests in segregation and southern history. Of the 150 acts passed in the session, ten bills and two resolutions dealt with massive resistance to desegregation. One such law passed after the flag bill, the Interposition Resolution, declared the *Brown* cases and all

similar decisions to be null and void. Finding that the Supreme Court had usurped powers reserved to the states in *Brown,* it repudiated the Court's right to declare state laws unconstitutional. It also asserted that Georgia had the right to decide for itself how to educate its children in keeping with the State's segregated social structure. The resolution passed with twenty-five abstentions and only one dissent.

Many observers felt that by 1956, the Confederate battle flag had degenerated into a Dixiecratic symbol of white supremacy and defiant resistance to federal efforts at integration. (*See, e.g.,* affidavits of Dan Carter, Joseph H. Beasley, Joseph E. Lowery, and Teresa Nelson). To some, the battle flag represented the Ku Klux Klan. In fact, the Klan's stationery in 1995 depicts this flag.

---

7. The bill the legislature adopted is codified at O.C.G.A. § 50-3-1. It describes the new flag and then states:

Every force of the organized militia shall carry this flag when on parade or review.

## II. *MOTION FOR SUMMARY JUDGMENT*

 Defendants now move for summary judgment on all claims. The court will grant summary judgment if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 254, 106 S.Ct. 2505, 2510, 2513, 91 L.Ed.2d 202 (1986). Under Fed.R.Civ.P. 56(c), summary judgment is mandated against a party who, after adequate discovery, "fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). While the evidence and factual inferences are to be viewed in a light most favorable to the non-moving party, *Rollins v. TechSouth, Inc.,* 833 F.2d 1525, 1529 (11th Cir.1987), the non-moving party is required to do "more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

Defendants argue that they are entitled to summary judgment because (1) Plaintiff lacks standing to sue because his subjective assertions of injury are too speculative and the claimed connection between Plaintiff's injury and the flag is too remote; (2) the complaint fails to state a legal issue, raising instead a political question, (3) Plaintiff's § 1983 claims are barred by laches or Georgia's two year statute of limitations for personal injury claims; and (4) Plaintiff's substantive claims fail as a matter of law. However, in its order denying Plaintiff's motion for a preliminary injunction, this court found Defendants' procedural arguments to be unpersuasive. Defendants subsequently have presented no new evidence or argument meriting that this court revisit its earlier decisions on these issues. Accordingly, the court turns to the merits of Plaintiff's substantive claims.

 Plaintiff first argues that both the enactment and the continued display of the Georgia state flag deny him the equal protection of the laws guaranteed by the Fourteenth Amendment. Although there is no dispute that O.C.G.A. § 50–3–1 is neutral on its face, even a facially neutral statute may be unconstitutional where it is racially motivated and results in a disparate effect on the minority group. *See Hunter v. Underwood,* 471 U.S. 222, 231–32, 105 S.Ct. 1916, 1921–22, 85 L.Ed.2d 222 (1985); *N.A.A.C.P. v. Hunt,* 891 F.2d 1555, 1562 (11th Cir.1990). As such, to withstand a motion for summary judgment, Plaintiff must come forward with evidence demonstrating both that racial animus motivated the passage of O.C.G.A. § 50–3–1 and that the statute has resulted in some kind of disparate effect on African–Americans. *See Personnel Admin. of Mass. v. Feeney,* 442 U.S. 256, 273, 99 S.Ct. 2282, 2293, 60 L.Ed.2d 870 (1979); *McCleskey v. Kemp,* 481 U.S. 279, 292, 107 S.Ct. 1756, 1767, 95 L.Ed.2d 262 (1987).

 As the court held in its order denying Plaintiff's motion for a preliminary injunction, Plaintiff must show that the flag has resulted in a concrete, present-day discriminatory impact on African–Americans to satisfy the second prong of the equal protection test.[8] *Cf. McCleskey,* 481 U.S. at 292, 107 S.Ct. at 1767. Instead of pointing to such evidence, however, Plaintiff instead argues that while the flag's effect upon him is not "immediately recognizable," he nevertheless has suffered disparate harm as a result of the flag. Plaintiff states that because the General Assembly adopted the flag as a message of resistance to desegregation, the flag's very existence calls upon the citizens of Georgia to adopt the "symbolic state policy" of discrimination. In addition, Plaintiff states that the flag both has caused Plaintiff to fear that he will be the victim of racial

---

8. Plaintiff cites the Supreme Court's decision in *Brown v. Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954) for the proposition that disparate harm need "not be specifically identifiable, but may amount to feelings of inferiority such that they cause harm to the Afri-can–American community." (Pl.Brief in Opp. at 24). *Brown,* however, is clearly distinguishable from the instant case in that the statute at issue was anything but facially neutral and explicitly classified school children on the basis of race.

violence and has resulted in his devaluing himself as a person.

Plaintiff has failed to make a specific showing that he has suffered disparate harm from the flag's existence. There simply is no evidence in the record indicating that the flag *itself* results in discrimination against African–Americans. As Plaintiff has acknowledged, there is no consensus today, almost forty years after the flag's adoption by the General Assembly, on its meaning. There are citizens of all races who view the flag as a symbolic acknowledgement of pride in Southern heritage and ideals of independence. Likewise, there are citizens of all races who perceive the flag as embodying principles of discrimination, segregation, white supremacy, and rebellion. Still other citizens either have no knowledge of the flag's historical enactment or have no interest in it.

■■■ The only statement about the flag that all may agree upon, therefore, is that the flag fails as a unifying symbol for citizens of Georgia. This fact does not subject the flag to judicial scrutiny absent specific and concrete examples that the flag has caused a disparate effect on African–Americans. Because Plaintiff has presented no such evidence and rests solely on his own assertions that he has suffered a disparate impact, the court need not consider whether racial animus was a "motivating factor" in the flag's passage.[9] Accordingly, the court must grant Defendants' motion for summary judgment on this issue.

Plaintiff next argues that the state flag violates his First Amendment rights because it compels him to be the courier of an ideological message to which he objects. As a citizen of Georgia, he is "forced to associate with the most prominent symbol of the State, the flag." (Def.Brief in Opp. at 28). Because he often conducts research in public buildings, he is forced to show allegiance to the discriminatory message embodied in the flag.

■■■ The court, however, finds no legal support for Plaintiff's contention. It is true that the First Amendment prohibits states from forcing its citizens to participate in the dissemination of ideas that they find objectionable. *Wooley v. Maynard,* 430 U.S. 705, 713, 97 S.Ct. 1428, 1434, 51 L.Ed.2d 752 (1977). However, the case law discussing this right involves either the forced display of the state's message on private property or the compulsion of an affirmative acknowledgment of that message. *See, e.g., Id.* at 714, 97 S.Ct. at 1435 (prohibiting state from requiring citizens to display the state motto "Live Free or Die" on their license plates); *Miami Herald Pub. v. Tornillo,* 418 U.S. 241, 257, 94 S.Ct. 2831, 2839, 41 L.Ed.2d 730 (1974) (invalidating statute forcing newspapers to publish the replies of political candidates whom the paper had criticized); *and Bd. of Educ. v. Barnette,* 319 U.S. 624, 636, 63 S.Ct. 1178, 1184, 87 L.Ed. 1628 (1943) (prohibiting forcing students to participate in daily ceremony honoring flag).

■■■ The state of Georgia does not require that Plaintiff acknowledge or display the flag, and the court finds that entering a public building displaying the flag is an insufficient action to associate Plaintiff with its message.[10] *Accord Hunt,* 891 F.2d at 1565–6; *and PruneYard Shopping Center v. Robins,* 447 U.S. 74, 87, 100 S.Ct. 2035, 2044, 64 L.Ed.2d 741 (finding that where shopping center was open to the public, views expressed by the public would not "likely be identified with that of the owner"). While Plaintiff may feel uncomfortable entering a building flying the flag, the court "is not empowered to make decisions based on social sensitivity." *Hunt,* 891 F.2d at 1565.

■■■ Plaintiff also argues, however, that the existence of the flag violates his First

---

9. Although Plaintiff argues that he will present evidence of the sociological impact of the flag "at trial," he may not rely on conjectural evidence to defeat a motion for summary judgment. *Mack v. Great Atl. & Pac. Tea Co., Inc.,* 871 F.2d 179, 181 (1st Cir.1989). Had Plaintiff wished to develop this evidence, he had ample time to do so prior to the court's decision on this issue.

10. Plaintiff equates entering a public building flying the Georgia state flag to entering a building flying a giant swastika or prominently displaying a cross. While there is some merit in Plaintiff's contention, his analogy fails to recognize that while the symbolism of the Georgia state flag is ambiguous, the symbolism associated with the swastika and cross is not.

Amendment rights because it "overshadows" his own right to speak and interferes with his right to associate with others freely. The court does not find, however, that Georgia has attempted in adopting the flag to "monopolize the market place of ideas," thus drowning out other speech. *Red Lion Broadcasting Co. v. F.C.C.*, 395 U.S. 367, 390, 89 S.Ct. 1794, 1806, 23 L.Ed.2d 371 (1969). The fact that Plaintiff is a member of group attempting to change the flag itself contradicts Plaintiff's assertion. Flag poles on public buildings, moreover, are not public forum such that the state may limit their use to its purposes alone as long as "the reservation is reasonable and is not an effort to suppress expression." *Hunt*, 891 F.2d at 1566. Plaintiff has pointed to no evidence demonstrating that the state's limitation is unreasonable such that it has violated the First Amendment.

■ Plaintiff likewise has presented no evidence that the flag has interfered with his freedom of expressive association with Caucasians. As the court found in its March 31, 1995 order, the flag is sufficiently ambiguous that it is impossible to conclude that it is the flag itself rather than Plaintiff's own emotions which has created Plaintiff's difficulty in associating with others. As such, Plaintiff's challenge to the flag cannot stand on this basis.

■ Similarly, Plaintiff cannot maintain that the flag violates the Due Process Clause by depriving him of his fundamental privacy interest in intimate associations with Caucasians free from government intrusion. It is true that "freedom of association receives protection as a fundamental element of personal liberty." *Roberts v. United States Jaycees*, 468 U.S. 609, 618, 104 S.Ct. 3244, 3249, 82 L.Ed.2d 462 (1984). Not all kinds of association, however, are constitutionally protected. Rather, the Due Process Clause protects only "certain kinds of highly personal relationships" like the family which foster close personal bonds, cultivate shared ideals, and reflect the realization that individuals draw their emotional enrichment from close

ties with others. *Id.* at 618, 104 S.Ct. at 3249. These relationships are distinguished by such factors as "relative smallness, a high degree of selectivity in decisions to begin and maintain the affiliation, and seclusion from others in critical aspects of the relationship." *Id.*

Plaintiff's claim that the flag has interfered with his association with Caucasians, a large, undifferentiated group, does not fit the "intimate relationship" criteria for protection. More importantly, Plaintiff has provided no evidence demonstrating that his relationships with Caucasians have been hampered because of the flag's existence. Accordingly, Defendants' are entitled to summary judgment on this claim as well.

■ Plaintiff next argues that the flag violates his liberty interests because his "association with the state" subjects him to the possibility of criminal prosecution under the Smith Act, 18 U.S.C. § 2385. As the court found in its March 31, 1995 order, however, Plaintiff's acts are not within the ambit of this Act. *See Scales v. United States*, 367 U.S. 203, 81 S.Ct. 1469, 6 L.Ed.2d 782 (1961). The singular act of residing in Georgia simply cannot constitute sufficient evidence to establish the requisite intent.

■ In his motion for a preliminary injunction, Plaintiff argued that the flag's intimidating and coercive presence infringes on his right to the full and equal enjoyment of public facilities in violation of 42 U.S.C. § 2000a. However, when Defendants moved for summary judgment on this particular claim, Plaintiff did not address this argument in his response in opposition to Defendants' motion for summary judgment. As the court stated in its March 31, 1995 order, the initial burden of production on a Title II violation lies with Plaintiff. *See Dean v. Ashling*, 409 F.2d 754, 756 (5th Cir.1969).[11] Because Plaintiff has come forward with no new facts meriting that the court revisit its earlier conclusion that there is no legal or factual support for Plaintiff's theory, Defendants are entitled to summary judgment on this issue.

---

11. In *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir.1981), the Eleventh Circuit adopted as binding precedent decisions of the former Fifth Circuit handed down prior to October 1, 1981.

Finally, Plaintiff argues that the enactment and display of the Georgia state flag intimidates African–Americans into refraining from exercising their right to vote in violation of the Voting Rights Act of 1965, 42 U.S.C. § 1971.[12] Plaintiff, however, simply has failed to offer any evidence or legal argument demonstrating a connection between the flag and voting practices by African–Americans. The cases cited by Plaintiff are inapposite because each involved a statute with an explicit connection to voting. *See, e.g., Harper v. Virginia State Bd. of Elections,* 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1964) (poll tax); *Harman v. Forssenius,* 380 U.S. 528, 85 S.Ct. 1177, 14 L.Ed.2d 50 (1965) (voter qualifications in federal elections); *and Kramer v. Union Free Sch. Dist. No 15,* 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969) (qualifications for voting' is school district elections). Defendants therefore are entitled to summary judgment on this issue as well.

As such, no issues remain to be tried in this case and Defendants are entitled to summary judgment on all counts. While it is regrettable that the state has adopted as its flag a symbol which creates controversy and discontent in the minds of many, resolution of this matter ultimately must rest in the hands of the General Assembly of Georgia rather than in this court.

Accordingly, Defendants' motion for summary judgment [59–1] is GRANTED.

SO ORDERED.

---

**12.** The Voting Rights Act states in pertinent part that

[n]o person, whether acting under color of law or otherwise, shall intimidate, threaten, coerce, or attempt to intimidate, threaten, or coerce any other person for the purpose of interfering with the right of such other person to vote. 42 U.S.C. § 1971(b).