SONS OF CONFEDERATE VETERANS,
INC., et al., Plaintiffs,

v.

GLENDENING, et al., Defendants.

Civil Action No. S–97–178.

United States District Court,
D. Maryland.

Feb. 24, 1997.

David R. Melton, Rutherford Institute, Charlottesville, VA, David N. Pasti, Rockville, MD, for Plaintiffs.

J. Joseph Curran, Jr., Atty. Gen., Maureen M. Dove, Asst. Atty. Gen., Baltimore, MD, Edward R.K. Hargadon, Asst. Atty. Gen., BWI Airport, MD, Jonathan W. Action, II, Asst. Atty. Gen., Motor Vehicle Admin., Glen Burnie, MD, for Defendants.

Arthur B. Spitzer, Thomas M. Gordon, ACLU of National Capital Area, Washington, DC, Susan Goering, Dwight H. Sullivan, ACLU of Maryland, Baltimore, MD, Amicus Curiae.

## MEMORANDUM OPINION

SMALKIN, District Judge.

This action is before the Court on Plaintiffs' motion for preliminary injunction. The Defendants have opposed the motion, and they have also moved for summary judgment. The issues have been briefed, under an expedited scheduling order, by the parties. In addition, the American Civil Liberties Union of Maryland and the American Civil Liberties Union of the National Capital Area have filed a reply brief *amici curiae.* In view of the thorough briefing, no hearing is necessary under the Rules of this Court. Local Rule 105.6., D.Md. Although, ordinarily, a hearing on a motion for preliminary injunction is appropriate, this Court will decide this motion on the written memoranda, because there are no disputes of fact. *Securities and Exchange Comm'n v. Graye,* 156 F.Supp. 544, 547 n. 3 (S.D.N.Y.1957); *cf. Lone Star Steakhouse & Saloon v. Alpha of Virginia,* 43 F.3d 922, 938 (4th Cir.1995); *United States v. Richlyn Laboratories, Inc.,* 822 F.Supp. 268, 271 (E.D.Pa.1993); *United States v. Production Plated Plastics, Inc.,* 762 F.Supp. 722, 729 (W.D.Mich.1991), *opinion adopted,* 955 F.2d 45 (6th Cir.), *cert. denied,* 506 U.S. 820, 113 S.Ct. 67, 121 L.Ed.2d 34 (1992).

The Plaintiffs in this action are The Sons of Confederate Veterans, Inc., a Tennessee corporation ("SCV"), The Sons of Confederate Veterans, Inc., Maryland Division ("SCV–MD"), Peter W. Orlebeke, the Commander-in–Chief of the SCV, and Patrick J. Griffin, III, the Lieutenant Commander–in–Chief of the SCV and a member of SCV–MD. The SCV is a non-profit, historical, educational, and benevolent organization whose membership consists of men who can demonstrate genealogically that one of their ancestors served honorably in the Confederate armed forces in connection with the War Between the States, or the Civil War, as it is variously known. (Cmplt.¶ 10).

The Defendants are the Governor of Maryland, the Secretary of the Department of Transportation of Maryland, and the Administrator of the Motor Vehicle Administration ("Administrator"). The Motor Vehicle Administration ("MVA"), a unit of the Department of Transportation, is responsible for, among other things, registering motor vehicles and issuing registration ("license") plates to vehicles registered in Maryland. As part of its duties, the MVA may issue special registration plates for qualifying non-profit organizations. Md.Code Ann., Transp. II § 13–619 (1992 & Supp.1996). These "organization" plates may take the form of either: a "non-logo" plate, bearing a special tag number and the name, initials, or abbreviation of the name of the organization; or a "logo" plate, bearing a special tag number, the name, initials, or abbreviation of the name of the organization, and an emblem or logo that symbolizes the organization. Md.Code Ann., Transp. II § 13–619(g)(I) and (ii); COMAR 11.15.19.03A.

To qualify for organization plates, a motor vehicle owner must satisfactorily demonstrate that he or she is a member of a nonprofit organization and is in compliance with MVA regulations. Md.Code Ann., Transp. II § 13–619(c)(1). In addition, at least twenty-five owners of vehicles in a particular class must apply for the special registration plates, and at least twenty-five such plates must be issued initially. Md.Code Ann., Transp. II § 13–619(c)(2). The vehicle owner must also pay a fee of $15 for the special organization registration plates. Md. Code Ann., Transp. II § 13–619(e); COMAR 11.15.02.

Although MVA regulations do not specify any criteria for accepting or rejecting the submission of an organization's logo, the MVA apparently relies for this purpose on criteria set forth under the COMAR regulations for issuance of personalized registration ("vanity") plates. (Defs.' Opp'n at 3–4). Under these "adopted" regulations, the Administrator has the discretion to refuse to issue, to cancel, or to recall a plate if, among other things, it could be considered objectionable or offensive as a term of bigotry, a term of hostility, an insulting or derogatory term, or a racially degrading term. *Id.;* COMAR 11.15.07.01(5).

In June, 1995, forty-two members of the SCV–MD applied to the MVA for organization logo plates. (Pls.' Mem. in Supp. at 3). The requested plates were to bear the name "Sons of Confederate Veterans" under the tag number and a logo depicting the Confederate battle flag bounded by the name "The Sons of Confederate Veterans" and the year "1896." (Pls.' Mem. in Supp. Ex. 6). The Confederate battle flag is an element of the registered trademark of the SCV and has been used by the organization as its symbol for over 100 years. (Pls. Mem. in Supp. at 3). On December 6, 1996, the MVA, without objecting to the logo, authorized and issued 78 license plates containing this design. (Cmplt.¶ 23).

After the SCV–MD organization plates were issued, the MVA received "numerous complaints" about them. (Cmplt.¶ 60). In response to the complaints, the Administrator informed Mr. Griffin by letter dated January 2, 1997, that the MVA "was withdrawing its approval to the Sons of Confederate Veterans Organization to display the special license plates as they are currently designed" and that it was recalling such plates already issued. (Pls.' Mem. in Supp. Ex. 11). The Administrator explained that his decision was "based on numerous, substantial complaints we have received in recent days about the apparent negative racial connotations of the logo design displayed on the plate." *Id.* The SCV–MD was invited, however, "to submit

logo artwork with an alternative design that is not perceived to be racist." *Id.*

Despite the MVA notice, on January 14, 1997, Mr. Griffin applied for an SCV–MD organization plate for one of his vehicles. (Cmplt.¶ 80). The request was denied. (Cmplt.¶ 83). On January 31, 1997, Mr. Griffin again received a letter from the MVA informing him that the SCV–MD organization plates were being recalled and instructing him to return his plates. (Pls.' Mem. in Supp. Ex. 16). The MVA offered to replace the plates being recalled with a non-logo plate bearing only the name "Sons of Confederate Veterans" and renewed its offer to replace the plates with a new logo plate containing "artwork that is not perceived to be racist." *Id.* The MVA has voluntarily suspended the recall effort until February 26, 1997, pending the present decision of this Court.

On January 20, 1997, the SCV, the SCV–MD, Mr. Orlebeke, and Mr. Griffin sued the Defendants, in their official capacities, for suspending the issuance of the SCV–MD organization logo plates and ordering the recall of previously issued SCV–MD plates. In their five-count Complaint, the Plaintiffs allege a violation of their rights to free speech as guaranteed by the First and Fourteenth Amendments and 42 U.S.C. § 1983 (Count I), a violation of the equal protection clause guaranteed by the Fifth and Fourteenth Amendments and 42 U.S.C. § 1983 (Count II), a violation of their rights under the Ninth Amendment and 42 U.S.C. § 1983 (Count III), a procedural due process violation under the Fifth and Fourteenth Amendments and 42 U.S.C. § 1983, based on the proposed denial of the special registrations (Count IV), and a procedural due process violation under the Fifth and Fourteenth Amendments and 42 U.S.C. § 1983, stemming from the recall of already-issued license plates in which Plaintiffs allegedly had a property interest (Count V). The Plaintiffs seek a declaratory judgment, a mandatory injunction that the MVA continue issuing SCV–MD logo plates, a prohibitory injunction restraining the MVA from recalling the logo plates, nominal and compensatory damages for the intentional violation of Plaintiffs'

constitutional rights, and reasonable attorneys' fees and costs under 42 U.S.C. § 1988.

On February 3, 1997, the Plaintiffs filed a motion for preliminary injunction, in which they argued that the MVA's actions constituted an impermissible content-based and viewpoint-based restriction on speech and an unconstitutional prior restraint. The Defendants opposed the motion, arguing that, because the organization logo plates constitute a nonpublic forum and because the MVA's actions were both reasonable and viewpoint neutral, there was no First Amendment violation. The Defendants also moved for summary judgment on all counts in the Complaint.

■ Although this case is before the Court on a motion for preliminary injunction, because there are no disputed facts, the Defendants have requested that the Court forego ruling on the preliminary injunction motion and reach the merits of the issues. (Defs.' Opp'n at 2). Ordinarily, on such a motion, this Court would consider whether the Plaintiffs had made the requisite showing to warrant the issuance of a preliminary injunction, but the Defendants' request has obviated that need. *See Walsh v. Local Board No. 10, Mount Vernon, New York,* 305 F.Supp. 1274, 1279 (S.D.N.Y.1969) (treating a motion for preliminary injunction as a motion for summary judgment and granting plenary relief on the merits where there were no genuine issues as to any material fact requiring either an evidentiary hearing or a trial on the merits). Also under Fed.R.Civ.P. 65, a hearing on a motion for preliminary injunction may be consolidated with a trial on the merits. In its scheduling letter, the Court notified the parties that it might do so here. In that there is no need for a hearing, it makes perfect sense to read "hearing" in this case under Rule 65 as subsuming summary adjudication. Thus, the Court will proceed directly to the merits.

At the outset, the Court notes that the MVA's objection to the SCV–MD organization plates is apparently based *solely* on their logo incorporating the confederate battle flag, and not on the organization name that appears on the license plate. (Defs.' Opp'n at 5). The Defendants do not dispute that

display of the logo is speech protected to some extent by the First Amendment of the United States Constitution. That is, flags and other symbols are entitled to First Amendment protection as variants of speech. *See, e.g., Texas v. Johnson,* 491 U.S. 397, 404–06, 109 S.Ct. 2533, 2539–40, 105 L.Ed.2d 342 (1989).

The Defendants correctly assert that the First Amendment does not protect all speech in all places and under all circumstances. *See Cornelius v. NAACP Legal Defense and Educational Fund, Inc.,* 473 U.S. 788, 799, 105 S.Ct. 3439, 3447, 87 L.Ed.2d 567 (1985); *Heffron v. Int'l Society for Krishna Consciousness, Inc.,* 452 U.S. 640, 647, 101 S.Ct. 2559, 2563–64, 69 L.Ed.2d 298 (1981). They do, of course, posit that such protection does not prohibit their recall of the plates. An American governmental entity "has the power to preserve the property under its control for the use to which it is lawfully dedicated." *Cornelius,* 473 U.S. at 800, 105 S.Ct. at 3448. To determine whether the government's interest in restricting the use of its property to its intended purpose outweighs the interest of those desiring to use the property, the United States Supreme Court has employed a "forum" analysis. *Id.* Under this analysis, the extent to which government can lawfully regulate speech depends upon the nature of the forum in which it is asserted. *Id.*

The United States Supreme Court has recognized three types of fora: the traditional public forum, the limited or designated public forum, and the nonpublic forum. *Id.* at 802, 105 S.Ct. at 3449. Traditional public fora are places, such as public streets and parks, which "by long tradition or by government fiat have been devoted to assembly and debate." *Perry Education Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 45, 103 S.Ct. 948, 954, 74 L.Ed.2d 794 (1983). A limited or designated public forum is created by "government designation of a place or channel of communication for use by the public at large for assembly and speech, for use by certain speakers, or for the discussion of certain subjects." *Cornelius,* 473 U.S. at 802, 105 S.Ct. at 3449. A nonpublic forum is "public property which is not by tradition or designation a forum for public communica-

tion." *Perry Education Ass'n,* 460 U.S. at 46, 103 S.Ct. at 955. It consists of property usually incompatible with expressive activity. *See Cornelius,* 473 U.S. at 804, 105 S.Ct. at 3450.

The government's regulation of speech in both the traditional and limited or designated public fora is subject to strict scrutiny. *United States v. Kokinda,* 497 U.S. 720, 726–27, 110 S.Ct. 3115, 3119–20, 111 L.Ed.2d 571 (1990). Thus, a content-based regulation in either of these fora is presumed unconstitutional and will only be permitted if it is narrowly tailored to serve a compelling government interest. *Perry. Education Ass'n,* 460 U.S. at 45, 103 S.Ct. at 954–55. The government may also enforce narrowly tailored and content-neutral time, place, and manner restrictions, if the restrictions serve a significant government interest and leave open ample alternate channels of communication. *Id.* In the nonpublic forum, however, the government's regulation of speech is subject only to a reasonableness test, but with a requirement, discussed *post,* of viewpoint neutrality. *Kokinda,* 497 U.S. at 727, 110 S.Ct. at 3120. Thus, "[c]ontrol over . . . a nonpublic forum can be based on subject matter and speaker identity so long as the distinctions are reasonable in light of the purpose served by the forum and are viewpoint neutral." *Cornelius,* 473 U.S. at 806, 105 S.Ct. at 3451.

Regardless of the type of forum, any governmental regulation of speech must be viewpoint-neutral. That is, the government may not target the "particular views taken by speakers on a subject," in an effort "to discourage one viewpoint and advance another." *See Rosenberger v. Rector and Visitors of the University of Virginia,* — U.S. —, —, 115 S.Ct. 2510, 2516, 132 L.Ed.2d 700 (1995); *Monterey County Democratic Central Committee v. United States Postal Service,* 812 F.2d 1194, 1198 (9th Cir.1987), *cited with approval in Kokinda,* 497 U.S. at 736, 110 S.Ct. at 3124–25. Nor may the government restrict speech based on "the specific motivating ideology or the opinion or perspective of the speaker." *Rosenberger,* — U.S. at —, 115 S.Ct. at 2516. When the government denies access to speakers solely to sup-

press their point of view, "the violation of the First Amendment is all the more blatant." *Id.* The rationale for prohibiting the government from engaging in viewpoint discrimination is that such actions raise " 'the specter that Government may effectively drive certain ideas or viewpoints from the marketplace.' " *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.,* 502 U.S. 105, 116, 112 S.Ct. 501, 508, 116 L.Ed.2d 476 (1991).

█ The Defendants argue that an organization logo plate is a non-public forum and that the MVA's decision to prohibit SCV–MD from displaying the Confederate battle flag on the plate was both reasonable and viewpoint-neutral. The Court need not decide whether the organization plate is a public or nonpublic forum, however, because the MVA's actions constitute impermissible viewpoint discrimination in either forum, for reasons that follow.

The Defendants contend that the MVA's opposition to the SCV–MD's Confederate battle flag logo is viewpoint-neutral because the MVA's adopted guidelines for reviewing logos, which apparently have been applied to prohibit the use of racial epithets such as "KIKE" and "JAP" on non-logo vanity plates, proscribe "hostile and racially derogatory expressions from any point of view." (Defs.' Opp'n at 13). In other words, the Defendants argue that, because the guidelines strike at an entire class of viewpoints, no viewpoint discrimination has occurred. Such a view of the law has been repeatedly rejected. *See Rosenberger,* —— U.S. at ——, 115 S.Ct. at 2518; *Lamb's Chapel v. Center Moriches Union Free School District,* 508 U.S. 384, 113 S.Ct. 2141, 124 L.Ed.2d 352 (1993); *Air Line Pilots Ass'n v. Department of Aviation,* 45 F.3d 1144 (7th Cir.1995); *Pruitt v. Wilder,* 840 F.Supp. 414 (E.D.Va. 1994). Indeed, such broad-based regulations are often simply a mask for viewpoint discrimination.

In *Air Line Pilots Ass'n,* the city prohibited all political advertising in city-operated advertising display cases at the airport. 45 F.3d at 1148–49. In analyzing whether this ordinance discriminated on the basis of viewpoint, the Seventh Circuit observed:

The district court held that because all "political" advertisements had been barred, no viewpoint discrimination existed. This determination effectively avoided viewpoint inquiry by retreating to an exaggerated level of generality. The appropriate focus of the viewpoint inquiry examines whether the proposed speech dealt with a subject that was "otherwise permissible" in a given forum. (citations omitted). The inquiry cannot be evaded by retreat to the category of speech allegedly banned (here, "political"). It may be that an entire category of speech is banned but this hardly satisfies a viewpoint inquiry. *Lamb's Chapel,* 508 U.S. at 392–94, 113 S.Ct. at 2147 (holding that, despite the fact that all religious speech was excluded, excluding religious viewpoint on a subject that was otherwise discussed was impermissible viewpoint discrimination). It therefore matters little whether the entire category of "political" speech was prohibited.

*Id.* at 1159.

Undoubtedly, the Confederate battle flag does not represent the same thing to everyone. As discussed in *Coleman v. Miller,* 912 F.Supp. 522, 530 (N.D.Ga.1996),

There are citizens of all races who view the flag as a symbolic acknowledgement of pride in Southern heritage and ideals of independence. Likewise, there are citizens of all races who perceive the flag as embodying principles of discrimination, segregation, white supremacy, and rebellion. Still other citizens either have no knowledge of the flag's ... [history] or have no interest in it.

*Id.* The SCV and SCV–MD indisputably view the flag in their logo as representing "honor and chivalry in battle during the War between the States." (Pls.' Reply Mem. at 2). Presumably, the numerous, unnamed persons who complained to the MVA view that same flag as a symbol of racial oppression and hostility. In light of these divergent views, when the MVA Administrator, in response to "numerous complaints," halted the issuance of SCV–MD organization plates bearing the Confederate battle flag logo and ordered the recall of all previously issued such plates, it is

plain beyond dispute that he advanced the viewpoint of those offended by the flag and discouraged the viewpoint of those proud of it.

The facts in this case are rather analogous to those in *R.A.V. v. City of St. Paul*, 505 U.S. 377, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992). In *R.A.V.* the city passed a criminal ordinance making it a misdemeanor for a person to place a symbol or object on private property (obviously a non-public forum), such as a burning cross or swastika, if that person knew or had reason to know that it would arouse anger, alarm, or resentment in others on the basis of race, color, creed, religion, or gender. 505 U.S. at 380, 112 S.Ct. at 2541. In striking down the ordinance as unconstitutional, the Court noted:

> Displays containing abusive invective, no matter how vicious or severe, are permissible [under the ordinance] unless they are addressed to one of the specified disfavored topics. Those who wish to use "fighting words" in connection with other ideas—to express hostility, for example, on the basis of political affiliation, union membership, or homosexuality—are not covered. The First Amendment does not permit St. Paul to impose special prohibitions on those speakers who express views on disfavored subjects.

*Id.* at 391, 112 S.Ct. at 2547. Similarly, under the Defendants' guidelines, although the use of the Confederate battle flag logo to convey that the flag is a symbol of honor may be prohibited because it is a view that some may find offensive as racially hostile or degrading speech, the use of the flag (perhaps inside a red circle superimposed with an *x*) to denounce racism would presumably be permissible. The First Amendment does not countenance such viewpoint discrimination, even for the purpose of suppressing speech that may be perceived as racially degrading or hostile. *Iota Xi Chapter of Sigma Chi Fraternity v. George Mason University*, 773 F.Supp. 792, 795 (E.D.Va.1991), *aff'd*, 993 F.2d 386 (4th Cir.1993) (The First Amendment "does not recognize exceptions for bigotry, racism, and religious intolerance or ideas or matters some may deem trivial, vulgar or profane.") As has often been re-

peated, "[i]f there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414, 109 S.Ct. 2533, 2545, 105 L.Ed.2d 342 (1989).

The Defendants' actions throughout this whole controversy belie any notion that they acted in a viewpoint-neutral manner. Indeed, as the undisputed facts demonstrate, the MVA voiced no opposition to the SCV–MD logo until a public firestorm over the appearance of a Confederate battle flag on Maryland plates erupted. However well-intentioned or politically astute the MVA's revocation decision might have been in the wake of such controversy, " '[p]ublic intolerance or animosity cannot be the basis for abridgement of these constitutional freedoms.' " *Knights of the Ku Klux Klan v. Arkansas State Highway and Transportation Department*, 807 F.Supp. 1427, 1437 (W.D.Ark.1992) (quoting *Coates v. Cincinnati*, 402 U.S. 611, 615, 91 S.Ct. 1686, 1689, 29 L.Ed.2d 214 (1971)). A desire to stem listeners' reactions to speech is simply not a viewpoint-neutral basis for regulation. *Forsyth County v. The Nationalist Movement*, 505 U.S. 123, 134, 112 S.Ct. 2395, 2403, 120 L.Ed.2d 101 (1992); *see Cornelius*, 473 U.S. at 812, 105 S.Ct. at 3454 ("the purported concern to avoid controversy excited by particular groups may conceal a bias against the viewpoint advanced by the excluded speakers").

There is, finally, a remarkable element of historical irony involved in this case. As every American should know, the First Amendment is part of the Bill of Rights, adopted shortly after the country's governmental foundation was laid in the Constitution. The purpose of the First Amendment was—and remains—the protection of the expression of unpopular sentiments from governmental reprisals or censorship. As written, and as it stood in place for many, many years, the First Amendment restricted only the actions of the federal government. It took a war—the Civil War—to extend the strictures of the First Amendment to state governments. That is, without the Civil War, the ghosts of which pervade this case, there would not have been a Fourteenth

Amendment, the vehicle through which the Bill of Rights has been applied to the states. Thus, it is the very struggle for freedom and equality of treatment which opponents of the Confederacy won that extends protection to those who view the battle to preserve the Confederacy as an honorable cause. These persons are, most likely, a minority in current American society. But, the genius of the Bill of Rights and the Fourteenth Amendment is precisely the protection of minorities from majoritarian tyranny or reprisals of all sorts. The webs of history and the law are, indeed, both intricate and intermeshed, as we are all reminded by this case.

Accordingly, the Court holds that the Defendants' actions were unconstitutionally viewpoint-based. And because this Court finds that the Defendants' challenged actions were thus prohibited, it need not reach Plaintiffs' other constitutional claims.

■ In addition to declaratory and injunctive relief, the Plaintiffs sought nominal and compensatory damages in the amount of $1,000 for each violation of their constitutional rights. Because the Plaintiffs have sued the Defendants only in their official capacities, however, their claim for damages for past injuries is barred by the Eleventh Amendment. *Papasan v. Allain*, 478 U.S. 265, 278, 106 S.Ct. 2932, 2940, 92 L.Ed.2d 209 (1986).

Furthermore, there simply has been no compensable damage sustained by them, in that the Defendants have voluntarily refrained from enforcing the recall/reissue edict pending the Court's present decision. Moreover, in light of the Court's decision today, the Plaintiffs will not incur any future damages. Thus, Plaintiffs' request for nominal and compensatory damages is denied.

For the foregoing reasons, the Court will enter a Judgment Order that grants the Plaintiffs' request for declaratory relief, and it will enjoin the Defendants from recalling the previously issued SCV–MD logo organization plates and require them to issue and renew such plates if the applicant is otherwise entitled thereto under the statutes and regulations of the Defendants then in force. As stated above, Plaintiffs' request for nominal and compensatory damages will be denied.

### ORDER AND JUDGMENT

For the reasons stated in the foregoing Memorandum Opinion entered this date, it is, this 24th day of February, 1997, by the Court, ORDERED and ADJUDGED:

1. That the actions of the defendants in recalling currently-issued organizational logo Maryland motor vehicle registration plates bearing the logo of the Sons of Confederate Veterans, and the defendants' proposed refusal to issue or renew such plates in the future BE, and they hereby ARE, DECLARED to be violative of the plaintiffs' rights under the First Amendment, as incorporated in the Fourteenth Amendment;

2. That the defendants, and any and all persons acting in concert with them, BE and they hereby ARE, RESTRAINED and ENJOINED from recalling, or failing to issue or renew, the registration plates described in the preceding paragraph, provided that the applicant for such plates is otherwise qualified for them under then-current statutes and regulations;

3. That plaintiffs' claims for monetary relief BE, and they hereby ARE, DISMISSED;

4. That costs BE, and they hereby ARE, awarded to the plaintiffs; and

5. That the Clerk of Court mail copies hereof and of the foregoing Memorandum Opinion to counsel for the parties.